[Crim. No. 20080. Dec. 2, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
LORRIE SUE McCLARY, Defendant and Appellant.

**COUNSEL**

Lawrence M. Gassner, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Jay M. Bloom and Harley D. Mayfield, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**RICHARDSON, J.**—Defendant Lorrie Sue McClary appeals from a conviction of first degree murder. (Pen. Code, § 187.) Among other contentions, defendant asserts that the trial court committed reversible error when it permitted the prosecution to introduce into evidence (1) certain portions of a tape-recorded statement made by defendant during

the course of police interrogation, and (2) a filmed "reenactment" of the crime made by defendant shortly after recording her statement. Based upon our independent review of the record, we will conclude that both the statement and the reenactment were involuntary, being induced by implied threats of punishment and promises of leniency; that the error in admitting this evidence was prejudicial; and that accordingly defendant's conviction must be reversed.

On August 29, 1975, a highway patrolman discovered the body of 79-year-old Anna G. Mills in San Bernardino County. An autopsy determined that she had died from strangulation. Acting on information known to them, on September 30, 1975, San Bernardino County officers arrested defendant and her companion Sonny Wilson in San Mateo County, and within two hours of her arrest the officers conducted a taped "interview" with defendant, who was then 16 years of age. Although defendant's statements during this initial conversation were suppressed at trial, and accordingly are not directly at issue herein, we review the surrounding circumstances in some detail, as they bear on the propriety of the defendant's second interview, a part of which was submitted to the jury.

Defendant was arrested at 11:45 a.m., and her first statement to the interrogating officers was given around 1 p.m. the same day. The interview was conducted by Detective May and Sergeant Edmonds of the San Bernardino Sheriff's Department. May commenced the conversation by advising defendant that the officers were investigating Mrs. Mills' murder, that "we do have warrants for you and Sonny for the murder," based on "information we've developed," and that since defendant was "officially under arrest," the officers would advise her of her rights. May next informed defendant of her rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], including the right to appointed counsel, and asked defendant if she wished to talk with the officers. Defendant replied, "Well I don't have any money to get a lawyer or nothing like that." The officers explained that an attorney could be appointed for her without charge, and that "If you want an attorney present before you talk to us about anything down there [*sic*], you can have an attorney." Defendant replied, "OK, well um what a decision. *I'd like an attorney* because this is serious. I know that and I want to get as much help as I can because I didn't do anything." (Italics added.)

Despite defendant's immediate request for an attorney, the officers continued to interrogate her. Sergeant Edmonds accused defendant of having previously "lied" to the officers regarding a wallet connected to the murder, and he told defendant that "Now maybe you're not lying to us about the murder. We don't know. But we know that you're lying to us about this wallet. [¶] . . . So do you want to tell us anything about the wallet now?" Once again, defendant replied, *"I'd rather wait and talk to an attorney first."* (Italics added.) Yet the interrogation continued, the officers describing the various items of incriminating evidence which they had marshalled, and urging defendant "to tell your side of the story."

Thereupon, defendant explained that Mrs. Mills had picked up Sonny and her while they were hitchhiking; that they stayed at Mrs. Mills' cabin for a few days at her invitation; that Mrs. Mills left to visit friends; and that when she failed to return, defendant and Sonny notified the authorities. Defendant denied that she or Sonny had murdered Mrs. Mills, stating "I mean we did do some things wrong *which I'll discuss with my lawyer,* but we did not kill Mrs. Mills and we don't want to be blamed for that." (Italics added.)

The interrogation continued, and Sergeant Edmonds declared that although the officers had gathered much information about the murder, ". . . we're not going to tell you what we know. If you don't think enough of your own welfare to give us your side of the story." Stating that "We have enough information to fully prosecute you for murder," May then began a lengthy discourse, the substance of which was that defendant was a "liar," that the officers could prove she was lying, and that she could be tried either as a "principal" to murder thus subject to the death penalty, or as an accessory after the fact, depending on the extent of defendant's knowledge and involvement. (The officer's statement that defendant could be subject to the death penalty was incorrect for, under the law then in effect, the death penalty could not be imposed upon any person who was under the age of 18 years at the time of the commission of the offense; Pen. Code, § 190.3.)

The clear implication of the officer's remarks was that unless defendant changed her story and confessed her true involvement in the crime, she would be tried for murder. Thus, May stated at one point in the interview that "You can tell us the truth. You're [*sic*] involvement can be less than what we think it is right now. It might be more. I don't know. You're the one that's going to have to say. You can either be a

direct participant, or you can be an accessory after the fact. I don't know which one. You're the one that knows. What we're going to try you for unless your story turns out to be true and we can prove your part of the story true, you're going to be tried as a principal, as the person who committed the murder. Do you understand that? *Unless your story changes to where you can say something else happened* and we can prove you true, then you're going to be tried the other way." (Italics added.)

In response to the officer's discourse, defendant asked for a further explanation of the difference between a principal and an accessory. Detective May, explaining that a principal is one who committed the murder or participated in some way, whereas an accessory only has "knowledge" of the murder after it occurred, added, "They are not punishable by life imprisonment. They're not punishable by death." Once again, May stated that "unless we hear a different story," the officers would consider defendant the principal; that the officers have "shot down" defendant's version of the events; that "There may be another story which means maybe you are not directly involved, but maybe you're an accessory" and that "It's all up to you, Lorrie. We can't force you [to talk]."

The interview terminated at 2:50 p.m. after defendant stated *"I think I'd like to talk to a lawyer."* (Italics added.) This was the fourth time during the interview that defendant had asked for an attorney to assist her. No attorney was obtained.

Following the interview, defendant remained in police custody. Approximately two and one-half hours later the officers sought and obtained consent from her and Sonny to search their apartment, and brought defendant with them as they conducted the search, which search produced several items of property subsequently proved to have belonged to Mrs. Mills. (The propriety of the search was not challenged at trial, nor is it presently before us.) In the officers' car, following the search, defendant said that she "wished to tell the truth." Detective May informed her that because she had requested an attorney he could not discuss the matter with her unless she initiated the conversation. She replied that she did want to discuss the case in the absence of an attorney, and the conversation commenced at approximately 6:50 p.m., approximately four hours after the first interview had terminated.

The second interview was conducted by Detective May at the San Mateo County jail in Redwood City and was also tape recorded. At the commencement thereof, May established that defendant had requested the "re-interview," and that she was "now willing to talk . . . without an attorney present." Defendant also confirmed that no "promises" had been made to her to induce her to give a further statement. During the course of this conversation (which lasted 1 hour and 20 minutes), defendant admitted that she had wrapped a rope around Mrs. Mills' neck and pulled on it after Mrs. Mills had assertedly jabbed at Sonny and her with a knife; that Sonny also pulled on the rope as defendant and Mrs. Mills struggled with each other; and that Mrs. Mills died as a result of their actions. Defendant detailed the circumstances of the event, and of her attempts to cover up the killing. At the conclusion of the interview, defendant agreed to give a filmed "crime re-enactment," demonstrating in Mrs. Mills' kitchen the events which had transpired. The filmed reenactment of the killing of Mrs. Mills occurred the next day, October 1, 1975, in the victim's home in San Bernardino County. The statements and actions of defendant during the filming conformed substantially to the text of defendant's second interview previously recited.

Prior to trial, defense counsel objected to the introduction of the text of the first and second interviews, and of the filmed reenactment. The trial court, after a hearing, ruled that although the first interview was conducted in violation of *Miranda* v. *Arizona, supra,* 384 U.S. 436, and would be suppressed at trial, nevertheless since defendant voluntarily "initiated" the second interview, and consented to the reenactment, the text of the interrogation and portrayal was admissible. Accordingly, portions of the second interview, and the entire filmed reenactment, were admitted at trial and were disclosed to the jury.

Defendant's primary contentions on appeal are (1) that the second interview and filmed reenactment occurred following defendant's repeated requests for counsel, in violation of defendant's *Miranda* rights, and (2) that the interview and film were the product of improper police interrogation, including threats and promises. Under either theory, defendant contends, introduction of the evidence was error justifying reversal of her conviction. As will appear, the two contentions are related and involve the determination of a single question: Did defendant *voluntarily* initiate the second interview with the officers?

## 1. *Miranda Violation*

The People concede that the officers violated defendant's *Miranda* rights when they ignored her repeated requests for an attorney to assist her, and that accordingly the text of her *first* statement was properly ruled inadmissible. ■ Indeed, the rule is well established that once a suspect "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning . . . . The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." (*Miranda, supra,* at pp. 444-445 [16 L.Ed.2d at pp. 706-707]; see *People* v. *Superior Court (Zolnay)* (1975) 15 Cal.3d 729, 735-736 [125 Cal.Rptr. 798, 542 P.2d 1390].) ■ It is defendant's position that once she requested an attorney, the officers should have immediately ceased their interrogation efforts and procured an attorney to assist her. Instead, the interrogation continued, ultimately resulting in the incriminatory statements made during the second interview and filmed reenactment.

The trial court found, however, that defendant initiated the second interview. ■ We have repeatedly held that "A suspect who has asserted his rights and prevented further lawful interrogation nonetheless retains the option, thereafter, *voluntarily* to initiate a confession." (Italics added, *People* v. *Superior Court (Zolnay), supra,* at pp. 736-737; see *People* v. *Superior Court (Keithley)* (1975) 13 Cal.3d 406, 412 [118 Cal.Rptr. 617, 530 P.2d 585]; *People* v. *Randall* (1970) 1 Cal.3d 948, 956, fn. 7 [83 Cal.Rptr. 658, 464 P.2d 114]; *People* v. *Fioritto* (1968) 68 Cal.2d 714, 719 [68 Cal.Rptr. 817, 441 P.2d 625].) In the present case, defendant herself acknowledged to Detective May that she requested the second interview, and the trial court (at the pretrial suppression hearing) determined that "From what evidence I have heard, even from her [defendant's] own testimony, she is the one that initiated the opportunity for the second interview."

As noted above, however, it is essential that a defendant's waiver of *Miranda* rights be a *voluntary* one. As stated in *People* v. *Randall, supra,* "a change of mind on the part of the defendant prompted by the advice of counsel, his own psychological make-up, or similar facts . . . is not proscribed by *Miranda* . . . ." (1 Cal.3d at p. 956, fn. 7.) On the other hand, "a change of mind prompted by continued interrogation and efforts to convince the defendant to communicate with the officers"

cannot be considered a voluntary, self-initiated conversation. (*Ibid.*) Thus, the resolution of defendant's *Miranda* contention requires us to resolve her second main contention: that she did not voluntarily initiate the second interview with the officers.

### 2. *Was the Second Interview Initiated Voluntarily?*

The trial court expressly found, based primarily upon defendant's maturity and "sophistication," and her prior contacts with police and juvenile officers, that she voluntarily initiated the second interview. ■ We are not bound, of course, by that determination for it is clear that " 'As a reviewing court it is our duty to examine the uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was properly found . . . . In exercising this function the court recognizes that the burden is on the prosecution to show that a confession was voluntarily given without previous inducement, intimidation or threat . . . .' [Citation.] Thus in making an independent examination of the record to ascertain whether defendant's statements were voluntary we follow a practice of the United States Supreme Court which is both well established . . . and currently adhered to. [Citations.]" (*People* v. *Sanchez* (1969) 70 Cal.2d 562, 571-572 [75 Cal.Rptr. 642, 451 P.2d 74]; see *People* v. *Haydel* (1974) 12 Cal.3d 190, 198 [115 Cal.Rptr. 394, 524 P.2d 866]; *People* v. *Randall, supra,* 1 Cal.3d 948, 954.) With respect to conflicting testimony, of course, "we accept that version of events which is most favorable to the People, to the extent that it is supported by the record." (*Ibid.*; accord *People* v. *Duck Wong* (1976) 18 Cal.3d 178, 187 [133 Cal.Rptr. 511, 555 P.2d 297]; *People* v. *Carr* (1972) 8 Cal.3d 287, 296 [104 Cal.Rptr. 705, 502 P.2d 513].)

■ In the present case, unlike most other cases, we are not confronted with any conflict in the evidence regarding the events which transpired during defendant's first interview with the police, for that interview was tape recorded and a transcription thereof has been presented to us. (See *People* v. *Brommel* (1961) 56 Cal.2d 629, 632 [15 Cal.Rptr. 909, 364 P.2d 845], involving a similar situation.) Our independent review of this transcript convinces us that defendant's second interview was involuntary, a product of improper police threats and inducements made during the course of the first interview, which threats and inducements we describe after a discussion of the applicable law.

We have said that, "If the confession was elicited by promises of benefit or leniency the evidence was inadmissible. [Citations.]" (*People* v. *Carr, supra,* 8 Cal.3d 287, 296; see *People* v. *Hill* (1967) 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908]; *People* v. *Johnson* (1969) 70 Cal.2d 469, 478-479 [74 Cal.Rptr. 889, 450 P.2d 265] [promises must be "motivating cause" of confession]; *People* v. *Brommel, supra,* 56 Cal.2d 629, 632 [same].) In *Hill,* we observed a line between mere police exhortation urging the suspect to talk to them, on the one hand, and express or implied offers of leniency, on the other; we explained that the distinction "does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police." (P. 549.) We noted that "When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made. (*Ibid.*) On the other hand, "if . . . the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear. [Citations.]" (*Ibid;* see also *People* v. *Nelson* (1964) 224 Cal.App.2d 238, 250-251 [36 Cal.Rptr. 385].)

Two cases which apply the foregoing general rules involved fact situations closely paralleling those in the present case. In *People* v. *Johnson, supra,* 70 Cal.2d 469, the officers informed a suspect (who was also a minor) that he had been accused of first degree murder and that he might go to the gas chamber. The officers exhorted the suspect to tell the truth, for the reason that no one would believe his denial of complicity. We noted that "This appears to be more than merely pointing out to a suspect that which flows naturally from a truthful and honest course of conduct. *It carries the implication that by cooperating and telling what actually happened he might not be accused of or found guilty of first degree murder* (i.e., more lenient treatment by the court or jury). *To someone unskilled and uncounseled in the law it might have offered a hope . . . that he might be cleared of any serious charges . . . .* It stretches the imagination to believe that he knowingly and intelligently waived his right to be free from self-incrimination." (70 Cal.2d at p. 479, italics added.) We also observed that although defendant's status as a minor was not conclusive, it was relevant to the question of his maturity and awareness of his rights. (*Ibid.*; see also *In re Dennis M.* (1969) 70 Cal.2d

444, 462-463 [75 Cal.Rptr. 1, 450 P.2d 296] [minor's capacity to waive counsel depends on "totality of circumstances" shown on record]; *People v. Lara* (1967) 67 Cal.2d 365, 379 [62 Cal.Rptr. 586, 432 P.2d 202] [same].)

In *People v. Brommel, supra,* 56 Cal.2d 629, the police informed the suspect that unless he changed his story (in which he denied that he had beaten his daughter), the officers would write the word "liar" on their report to the judge. We recognized that such conduct amounted to both a threat and an implied promise of leniency, rendering the subsequent confession inadmissible. (Pp. 633-634.)

In the matter before us, the record reflects that the officers repeatedly branded defendant a liar, and advised her that unless she changed her statement and admitted the true extent of her complicity, she would be charged as a principal to murder and would face the death penalty. In addition to this direct, and partially false (Pen. Code, § 190.3) threat, the officers strongly implied that if defendant changed her story and admitted mere "knowledge" of the murder, she might be charged only as an accessory after the fact. At trial, defendant testified that she decided to make a second statement as a result of the pressure exerted by the officers during the first interview, including their references to the death penalty.

We think the following facts are significant: Defendant, while doubt-less sophisticated for her years, was a 16-year-old girl; the officers failed to respond to any of defendant's repeated requests for the assistance of counsel; there was a relatively short time span between the two interviews during some of which time defendant had remained in the officers' presence; during the first interview defendant had several times been called a liar; the death penalty had been improperly mentioned; there were implications for leniency in the "principal vs. accessory" conversation. Taken together, we think it fair to conclude from the record that the threats of punishment and the promises of leniency echoed in the continuum between the two conversations to a degree which renders her statements in the second interview involuntary and inadmissible. In addition, the record indicates that the filmed reenact-ment of the killing was a direct product of the statements made by defendant at the second interview, and likewise must be considered involuntary and inadmissible. (*People v. Johnson* (1969) 70 Cal.2d 541, 547 [75 Cal.Rptr. 401, 450 P.2d 865, 43 A.L.R.3d 366] [second confession presumed a product of the first]; *People v. Sanchez, supra,* 70 Cal.2d 562,

574 [same].) The People have conceded that there was no break in the "causative chain" between the second interview and the filming.

■ Finally, we must conclude that the error in admitting the foregoing evidence was prejudicial to defendant and constitutes ground for reversing the judgment. ■ Under present rules for determining the existence of prejudicial error, the improper introduction of a *confession* is considered reversible per se (*People* v. *Randall, supra,* 1 Cal.3d 948, 958; *People* v. *Fioritto, supra,* 68 Cal.2d 714, 720), whereas wrongful introduction of an *admission* is deemed prejudicial unless the People show beyond a reasonable doubt that the error complained of did not contribute to the verdict (*Chapman* v. *California* (1967) 386 U.S. 18, 23-24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Spencer* (1967) 66 Cal.2d 158-168 [57 Cal.Rptr. 163, 424 P.2d 715]; *People* v. *Powell* (1967) 67 Cal.2d 32, 56 [59 Cal.Rptr. 817, 429 P.2d 137]). We have described a confession as amounting to a declaration of defendant's intentional participation in a criminal act, whereas an admission is merely the recital of facts tending to establish guilt when considered with the remaining evidence in the case. (*People* v. *Fitzgerald* (1961) 56 Cal.2d 855, 861 [17 Cal.Rptr. 129, 366 P.2d 481]; see *People* v. *Powell, supra,* at pp. 52-53.) ■ Defendant's second interview and filmed reenactment of the killing of Mrs. Mills contained much exculpatory material and possessed more of the characteristics of an admission than a confession. In effect, defendant's statement in the matter before us indicated that she unintentionally killed Mrs. Mills while attempting to prevent her unprovoked assault on Sonny and herself.

Nonetheless, we cannot say with confidence that introduction of this admission was harmless beyond a reasonable doubt. In the absence of defendant's admission, the prosecution had no direct proof of defendant's involvement with Mrs. Mills' death. (See *People* v. *Haydel, supra,* 12 Cal.3d 190, 202.) True, there was circumstantial evidence which linked defendant and Sonny with the crime, including their presence at the home of the deceased at or about the time of her death, their possession of various items of her property, and their forgery of some checks from her checkbook. But without defendant's admission, the jury might not have found that defendant killed Mrs. Mills or, alternatively, that such a killing was murder in the first degree. We think it significant that after the jury had taken the case under submission, it requested a second viewing of the filmed reenactment, suggesting the likely importance of that evidence to the jurors during their deliberations.

The People contend that the prejudicial impact of defendant's admission was lessened by her own trial testimony, which substantially paralleled the events described in the statement and film. We may properly assume, however, that defendant's testimony was impelled by the prosecutor's introduction of her admission during the People's case in chief. (See *People* v. *Powell, supra,* 67 Cal.2d at p. 57, fn. 9; *People* v. *Spencer, supra,* 66 Cal.2d at pp. 163-164; *People* v. *Stockman* (1965) 63 Cal.2d 494, 502 [47 Cal.Rptr. 365, 407 P.2d 277].) It seems likely that defendant would not have admitted killing Mrs. Mills but for the erroneous introduction of the foregoing evidence.

The judgment is reversed.

Bird, C. J., Tobriner, J., Mosk, J., Clark, J., Manuel, J., and Newman, J., concurred.