[Crim. No. 34516. Second Dist., Div. Five. May 22, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
NORVAL OWENS, Defendant and Appellant.

**COUNSEL**

Lee B. Ackerman, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Howard J. Schwab and Donald J. Oeser, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**STEPHENS, J.**—Defendant was convicted of voluntary manslaughter, a violation of Penal Code section 192, subdivision 1, a lesser included offense within the charged offense, murder. The jury also found that defendant had used a firearm during the offense within the meaning of

Penal Code sections 12022.5 and 1203.06, subdivision (a)(1). Sentence was to state prison.

Except to say that there was a killing, the facts are of no moment to the single issue raised on appeal, i.e., did the court err in admitting defendant's extrajudicial statements which are admissions.

So far as the circumstances surrounding the defendant's giving of his statements, Police Sergeant Iorio testified (outside the jury's presence) that the statements were made some 30 to 45 minutes after defendant's arrest. At the time the statements were made, defendant did not know they were being taped. Defendant clearly stated he did not wish to talk without having seen an attorney and this was repeated both before and after the giving of the *Miranda* warning.

It is defendant's contention that the determination to remain silent until after talking to an attorney, repeated at least four times before his admissions, required the officers to cease questioning him. The People argue that a suspect who has asserted his rights and prevented further lawful interrogation nonetheless retains the option, thereafter, voluntarily to initiate a confession or make statements to the police. (See *People* v. *McClary* (1977) 20 Cal.3d 218, 226 [142 Cal.Rptr. 163, 571 P.2d 620].) The question here is, as a matter of law, were the statements in violation of *Miranda* or were they voluntary?

The court concluded that the statements were voluntary and hence admissible. For the most part we agree.

The important portion of the recorded conversation between defendant and the officers is as follows:

"DEFENDANT: What's happenin', what's happenin' now?

"OFFICER: Say what?

"DEFENDANT: I do no talkin'.

"OFFICER: You're not doing any talkin'. What?

"DEFENDANT: I do no talkin'.

"OFFICER: Okay.

"DEFENDANT: I just wanna call my attorney and let him know where I'm at.

"OFFICER: No problem.

"DEFENDANT: And then I wanna go lay down...[unintelligible].

"OFFICER: Okay. Can I read you your rights?

"DEFENDANT: Yeah.

"OFFICER: I have to do that whether you're going to talk or not.

"DEFENDANT: Yeah. After that we're not gonna talk to you none.

"OFFICER: Okay, you have the right to remain silent. If you give up the right to remain silent anything you say can and will be used against you in a court of law, you have the right to speak with attorney and have the attorney present during questioning. If you so desire and cannot afford one, an attorney will be appointed for you without charge before questioning. Do you understand each of these rights I have explained to you?

"DEFENDANT: Yeah, I do.

"OFFICER: Do you wish to give up the right to remain silent?

"DEFENDANT: The right to remain silent? Yeah, I'm gonna be quiet.

"OFFICER: Okay. Then you don't wanna give up your right to remain silent. You're gonna keep your right to remain silent?

"DEFENDANT: Yeah, I'm gonna keep my right to remain silent.

"OFFICER: Do you wish to give up your right to speak with an attorney and have him present during questioning?

"DEFENDANT: Yes, I wanna talk to an attorney.

"OFFICER: Okay.

"DEFENDANT: I wanna call mine than I wanna see...[unintelligible]. 'eck, I don't got no money. I don't have no money to hire no attorney but I've talk to a few of them, and let him know I'm here. Know what I mean? He told me he wanted fifteen hundred dollars and I ain't got no fifteen hundred dollars—to bring him in here. I ain't got it, man, I don't have it. Simple as that. You know I mean, you know...[unintelligible]. It happens, man, it happens.'...[unintelligible]. Yeah, I just wanna call my attorney and I wanta go lay down.

"OFFICER: No problem.

"DEFENDANT: I ain't slept, man, I ain't slept since this shit happened. I wanna go lie down and lemme know where I'm at, man. Later on maybe at ten, eleven o'clock, then I might wanna call somebody and talk. After I wake up I want to go to court as soon as possible. Anything you wanna ask me, you can ask me. Whatever I say be held against me in court. I can tell you the whole story. So get the attorney in here then, you know...[unintelligible]. If I can afford it, let me call my idea. Like if you wanna know what happen: then, you know, and then I'll run it, man. Just what happen, man. You know, you know. So that's where I'm now, man. That's the frame of mind that I'm in now...[unintelligible].

"OFFICER: Okay. No problem at all. So what can I say—it's entirely up to you.

"DEFENDANT: You know but I just wanna say, you know, like, I just wanna say this one thing off the record, or it can be on the record, off the record, I didn't mean to kill that dude, man. You know, 'cause I don't put myself in no position for a Nigger to be doin' me like that. You hear what I'm sayin'?

"OFFICER: Right."

■ After this statement, the officers resumed questioning, referring to their questions as "booking questions." As we read the questions, they are basically repetitious inquiry about defendant's desire to remain silent until he had talked to an attorney. Certain statements were made by defendant and though they did not amount to a confession, they were additionally incriminating. As to these later questions by the officers, we find them to have been in violation of defendant's *Miranda* rights, but that does not require reversal. ■ The admission volun-

teered and, hence, clearly admissible that "You know but I just wanna say, you know, like, I just wanna say this one thing off the record, or it can be on the record, off the record, I didn't mean to kill that dude, man. . . ." identified defendant, beyond doubt, as the assailant. The defenses of self-defense or excusable homicide were not believed. ▮ The statements constituted an admission by defendant (see *People* v. *McClary* (1977) 20 Cal.3d 218, 230 [142 Cal.Rptr. 163, 571 P.2d 620]) and all subsequent statements were harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].) The case of *People* v. *Braeseke* (1979) 25 Cal.3d 691 [159 Cal.Rptr. 684, 602 P.2d 384] is distinguishable on its facts.

As we read the dissent, it would appear to extend *Miranda* beyond inquiry reasonably designed to elicit information relative to the crime under investigation. It suggests that even the giving of the *Miranda* warning is a violation of its own rule; this feeding on the rule by the rule itself would result in autoimmunization.

As we view the record, the case of *People* v. *Spearman* (1969) 1 Cal.App.3d 898, 905 [82 Cal.Rptr. 277], is quite similar. There the court said, relative to defendant's statement "'I have been trying real hard to go straight, I just made a mistake last night,' made when the officer stated he was not going to question defendant (because he knew defendant wanted an attorney) and was about to return defendant to his jail cell was spontaneous and voluntary. It was not error to admit the statement."

The judgment is affirmed.

Hastings, J., concurred.

KAUS, P. J.—I respectfully dissent. The transcript of the tape-recorded interrogation of defendant is 20 pages long, but one only has to read part of page 1 to realize that any later statement was obtained in clear violation of the principles set forth in *People* v. *Fioritto* (1968) 68 Cal.2d 714, 718-719 [68 Cal.Rptr. 817, 441 P.2d 625] and *People* v. *Pettingill* (1978) 21 Cal.3d 231, 237-241 [145 Cal.Rptr. 861, 578 P.2d 108]. I quote:

"DEFENDANT: What's happenin', what's happenin' now? OFFICER: Say what? DEFENDANT: *I do no talkin'.* OFFICER: You're not doing any

talkin'. What? DEFENDANT: *I do no talkin'*. OFFICER: Okay. DEFEN-
DANT: *I just wanna call my attorney* and let him know where I'm at.
OFFICER: No problem. DEFENDANT: And then I wanna go lay down...
[unintelligible]. OFFICER: Okay. Can I read you your rights.? DEFEN-
DANT: Yeah. OFFICER: I have to do that whether you're going to talk or
not. DEFENDANT: Yeah. After that *we're not gonna talk to you none.*"
(Italics added.) The officer then continued to talk to defendant by recit-
ing the *Miranda* formula. For awhile, defendant insisted that he was
"gonna be quiet" and "gonna keep [his] right to remain silent" and,
again, that he wanted to talk to an attorney. Defendant's loquaciousness
however got the better of him and pretty soon the interrogator had
what he wanted.

It seems to me that there were at least four places in the quoted por-
tion of the transcript where, on *Fioritto-Pettingill* principles, the
interrogation should have ceased. I know of no rule that the police have
a right to keep the conversation going by giving the suspect his
*Miranda* warning in the hope that one thing will lead to another and
that, in spite of his firm resolve to "do no talkin'" the suspect will do
just that.

Appellant's petition for a hearing by the Supreme Court was denied
July 23, 1980. Bird, C. J., was of the opinion that the petition should be
granted.