UNITED STATES of America,

v.

Bruce MILLER, Defendant.

No. CR–88–191C.

United States District Court,
W.D. New York.

June 12, 1989.

On Motion to Reconsider Aug. 18, 1989.

Dennis C. Vacco, U.S. Atty. (Joseph M. Guerra, Asst. U.S. Atty., of counsel), Buffalo, N.Y., for U.S.

Munley & Funda (Michael L. Munley, of counsel), Hamburg, N.Y., for defendant.

CURTIN, District Judge.

Pending before the court is defendant's motion to suppress certain evidence which defendant alleges was illegally obtained in violation of his rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution. The following constitutes the court's findings with regard to that motion, based on the relevant submissions on file as well as the testimony adduced at a hearing held on February 8 and 10, 1989.

The indictment in this case charges defendant, in Count 1, with bank fraud in violation of 18 U.S.C. § 1344(a); in Count 2, with bank robbery in violation of 18 U.S.C. § 2113(b); and, in Count 3, with conspiracy to commit bank fraud and bank robbery in violation of 18 U.S.C. § 371. This indictment stems from activities occurring in December, 1988, which resulted in the illegal

withdrawal of approximately $23,000.00 from automatic teller machines [ATMs] owned and maintained by Manufacturers and Traders Trust Company [M & T].

*Facts*

On December 15, 1988, based on information received from M & T officials, local Federal Bureau of Investigation [FBI] Agent Lester Skinner and other agents obtained a search warrant for the residence of Felicia Miller, defendant's cousin, who was registered as the holder of the M & T "QuickBank" card that was used to make the illegal withdrawals. During the execution of that warrant, Ms. Miller was advised of her rights, and admitted that she and defendant had used her "QuickBank" card to withdraw the $23,000.00 from the ATM. She also told the agents that she kept about $980.00, and gave the rest to defendant. Agent Skinner and Special Agent Mark Burbridge, accompanied by Ms. Miller, then proceeded to defendant's residence at 542 East Amherst Street, Buffalo, New York. Ms. Miller went inside, and shortly thereafter came back out with the defendant, whereupon the agents approached defendant and questioned him about the money. Defendant initially denied any knowledge of, or involvement in, the withdrawal of the money from the ATM. The agents then showed defendant a photograph taken from a videotape made during one of the illegal withdrawals, and informed defendant that they intended, by means of either a search warrant or by consent, to search the defendant's premises for evidence of the missing money. Defendant then went back inside the house, and a short time later came to the front door with an individual who identified himself as Ronald Miller, defendant's father and owner of the premises. After Ronald Miller secured his dog, Agent Skinner entered the premises, and defendant got in his car and left the vicinity. He was not pursued.

When Agent Skinner was inside the house, Ronald Miller told him that defendant lived in an upstairs bedroom, for which he paid $40.00 per month for "room and board." Ronald Miller then executed a written consent to search the premises, and

assisted Agent Skinner, now joined by Special Agent Keith Slotter, in the search. During this search, which included defendant's bedroom, no evidence was seized.

Shortly after the search of the premises was conducted pursuant to Ronald Miller's consent, defendant returned to 542 East Amherst Street. He was approached by Agent Skinner and Special Agent Michael Kogut, who resumed their questioning as to the whereabouts of the money. Ronald Miller was also present, and he encouraged his son to cooperate with the agents. Defendant then informed the agents that the money was not at the East Amherst Street residence, but that he would take them to the place where the money was hidden. At that point, defendant was handcuffed and placed in the agents' vehicle, whereupon defendant gave directions to an address on Grider Street at which a plastic shopping bag containing several twenty-dollar bills was retrieved from the wheel well of an automobile parked in an open garage. On the way back to East Amherst Street, defendant asked the agents what would happen if all of the money was not in the shopping bag and whether or not he was going to be arrested. The agents told defendant that they wanted all the money returned and that they did not yet know if they were going to arrest him.

Upon returning to defendant's residence shortly after 8 p.m., the handcuffs were removed from defendant, and one of the agents counted the money in the bag. The bag contained approximately $14,000.00, and defendant subsequently produced receipts for a $5,600.00 down payment on an automobile and for a television and video cassette recorder [VCR]. Defendant also produced $270.00 in cash.

At approximately 9 p.m., defendant read and signed an "advise of rights" form advising him of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and acknowledged his understanding of those rights. The agents then interviewed defendant about his involvement in the withdrawal of money from the ATM and recorded defendant's account of the events in written form. De-

fendant read the written account, indicated that it was accurate, and signed it at about 10 p.m. Defendant was then advised that he was being placed under arrest and was taken to the Erie County Holding Center, where he remained overnight. Just before the agents left the premises, they returned to defendant's room and seized the television and VCR located there.

At about 8:30 a.m. on December 16, 1988, defendant was brought to the FBI office for processing. He was again given an "advise of rights" form, which he read and executed before being interviewed by Agent Skinner. During that interview, of which no written record was made, defendant discussed his previous arrests. Defendant then appeared before United States Magistrate Edmund F. Maxwell for arraignment, setting of bail, and appointment of counsel. *See* Item 2 (Criminal Complaint), and affidavit attached thereto; Item 7 (Hearing Transcript); Item 9 (United States' Memorandum of Law); Item 11 (Defendant's Memorandum of Law).

*Arguments*

In support of his motion, defendant argues that the consent search of defendant's bedroom was unlawful and therefore all physical evidence seized and statements obtained as a result of that search must be suppressed. Item 11, pp. 6–7. According to defendant, the "consent to search" form executed by defendant's father was insufficient to permit the warrantless search of defendant's room, as well as the subsequent seizure of the television and VCR, since defendant clearly had an expectation of privacy in his room as evidenced by his payment of $40.00 per month to his mother for room and board. The United States argues that Ronald Miller's consent to search the premises was sufficient to allow for the seizure of the television and VCR from defendant's room since Ronald Miller was the owner of the residence, and the testimony shows that defendants' parents have full access to his bedroom. Thus, according to the United States, defendant's father had the "common authority" to consent to the search of the bedroom. Item 9, p. 14.

Defendant further contends that his statements made to the FBI agents on December 15, 1988, must be suppressed since they were made at a time when his freedom of movement was severely restricted but before he had been advised of his *Miranda* rights. Item 11, pp. 7–9. The United States argues that *Miranda* warnings are required only in instances of custodial interrogation and that the statements sought to be suppressed were made while defendant was either not in custody or not being interrogated. Item 9, pp. 15–20. Specifically, the government contends that the defendant was not in custody when he responded to initial questioning, and was shown the photographs, outside his residence (*id.*, pp. 15–16). With regard to the statements made while defendant was being transported, in handcuffs, to retrieve the money, the government contends that the handcuffs were employed solely for the personal safety of the agents and not as an indicia that defendant had been placed under arrest. *Id.*, p. 12. The government also contends that defendant did not object to being placed in handcuffs and voluntarily went with the agents to retrieve the money. *Id.* Furthermore, according to the government, the statements made by defendant during the time he was handcuffed were in the form of questions by defendant to the agents and thus there was no "interrogation" which required that *Miranda* warnings be given at that time. *Id.*, p. 16. With regard to statements made while the agents were counting the money in defendant's presence, the government contends that during that time the defendant was not being detained and was free to leave the premises, the questioning was in no way coercive, defendant was allowed to confer with his father and other family members, and nothing was seized as a result of any statements made by defendant at that time. *Id.*, pp. 17–18.

*Discussion*

A search conducted pursuant to voluntarily obtained consent is a well-recognized exception to the warrant requirement of the Fourth Amendment. *Schneckloth v.*

*Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

> [W]hen the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances....

412 U.S. at 248–49, 93 S.Ct. at 2059. In the instant case, the government puts forth several arguments as to the admissibility of evidence under the consent doctrine. First, the government contends that the $14,000 in cash retrieved from the garage on Grider Street, the receipts for the automobile, television, and VCR, and the additional $270 in cash from defendant's wallet, were voluntarily relinquished by defendant prior to his being placed in custody. The government also contends that the statements made by defendant prior to his reading and signing the advise of rights form were given voluntarily, and that Ronald Miller's consent to search defendant's room was sufficient to allow the subsequent seizure of the television and VCR.

■ Addressing this latter contention first, it is well-settled that a third person other than the defendant may consent to a search of the defendant's premises or effects if that third person has common authority over such premises or effects. *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). "Consent to a search by one with access to the area searched, and either common authority over it, a substantial interest in it or permission to exercise that access, express or implied, alone validates the search." *United States v. Gradowski,* 502 F.2d 563, 564 (2d Cir.1974). In the instant case, consent to search was obtained from defendant's father, who owned the single-family dwelling in which defendant's room was located. As defendant testified, both his father and his mother have full access to his room, despite the fact that he pays his parents $40.00/month rent. Item 7 (Tr.), p. 85.

Defendant cites *United States v. Jackson,* 647 F.Supp. 995 (S.D.Tex.1986), as an example of a case in which the court found a mother's consent to search her son's room insufficient to allow the evidence obtained from that search to be admitted. The *Jackson* court found, however, that the consent was involuntary, since it was given under duress, and thus could not form the basis for an exception from the warrant requirement of the Fourth Amendment. 647 F.Supp. at 1000. In the instant case, there is nothing to indicate that the consent given by defendant's father was the product of any type of duress or coercion, and thus the result in *Jackson* does not provide this court with persuasive precedent for suppression of the evidence obtained as a result of the search of defendant's room.

With regard to the issue of defendant's consent to take the agents to where the money was hidden, defendant argues that, from the moment the agents saw defendant in the company of Ms. Miller, and confronted him with a photograph taken at one of the ATMs, his freedom of movement was sufficiently restricted to entitle him to *Miranda* warnings before any of his statements, or any evidence seized as a result of those statements, could be used as evidence against him. Thus, according to defendant, any consent to relinquish the money or receipts was involuntarily given as a result of the coercive atmosphere inherent in the custodial situation which he faced.

■ In *Miranda,* the Supreme Court held that

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

384 U.S. at 444, 86 S.Ct. at 1612. The test for determining whether the defendant's

freedom has been significantly deprived is an objective one. "[I]n the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." *United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969). In each case, "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 713–14, 50 L.Ed.2d 714 (1977)); *see also United States v. Guarno*, 642 F.Supp. 139, 142 (N.D.N.Y. 1986). The Supreme Court has given some further guidance in answering this inquiry in *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). There the Court held

> that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

446 U.S. at 554, 100 S.Ct. at 1877.

Viewing the circumstances of the instant case in light of these standards, it is evident that defendant's right to be given *Miranda* warnings did not attach at the very outset of his encounter with the agents. When first confronted by the agents at his residence at approximately 7 p.m., it is clear that defendant was not placed in custody nor was his freedom of movement restrained in any significant way, as evidenced by the fact that defen-

dant thereafter got in his car and left the premises for a short time. However, the testimony shows that upon his return, there were no less than four FBI agents at the scene. Defendant was then urged by his father to cooperate with the agents, and he agreed to take the agents to where the bag containing the $14,000 was hidden. Defendant was then handcuffed and placed in the agents' vehicle for the trip to Grider Street. According to the agents, this was done as a routine measure for their own protection, and defendant did not object. No explanation is given, however, why some less intrusive means of ensuring their safety could not have been employed, such as a "pat down" for weapons prior to placing defendant in the car. It is difficult to give much credence to the government's contention that, once defendant was secured in the handcuffs and placed in the vehicle, the agents would have heeded his request to depart or would have allowed him to do so. Under these circumstances, it is apparent to the court that, from the moment he was handcuffed and placed in the agents' vehicle, defendant could reasonably have believed that he was not free to leave, and was effectively in custody for the purpose of invoking the procedural safeguards set forth in *Miranda* and required by the Fifth Amendment. Any consent to relinquish evidence given by defendant under such circumstances was involuntary, and the government's seizure of that evidence was not justified.

Accordingly, the pre-arrest circumstances presented to the court, as developed through the testimony adduced at the hearing, indicate that a deprivation of defendant's freedom of action occurred "of the degree associated with a formal arrest," *Beheler*, 463 U.S. at 1125, 103 S.Ct. at 3520, and thus defendant was entitled to *Miranda* warnings prior to fully agreeing to relinquish the incriminating evidence which the government seeks to introduce in the case against him. That evidence, including the television and VCR seized as a result of the second search of defendant's room,[1] is therefore not admissible. The

---

1. While the earlier search of defendant's room

may have been lawfully conducted pursuant to

court further finds that defendant's statements made after *Miranda* warnings were given on December 15, and again on December 16, were not obtained " 'by means sufficiently distinguishable to be purged of the primary taint,' " *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963) (quoting Maguire, Evidence of Guilt, 221 (1959)), and are likewise inadmissible.

Defendant's motion to suppress is granted.

So ordered.

## ON MOTION TO RECONSIDER

Now pending is the government's motion requesting the court to reconsider its order dated June 12, 1989 (Item 18), in which the court granted defendant's motion to suppress.

The government contends that the court misapplied the "custody" analysis of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), to the actual issue presented as to whether defendant voluntarily consented to take the FBI agents to where the bag of money was hidden. According to the government, the court's finding that the defendant was effectively "in custody" for the purposes of *Miranda* once he was handcuffed and placed in the police car, thus rendering the consent to search involuntary, was erroneous since "the handcuffs were placed on the defendant *after* he had agreed to take the agents to where the money was." Item 20, p. 4.

Upon careful reconsideration of the facts, testimony and arguments presented, the court finds insufficient reason to vacate the June 12 order. In that order, the court initially rejected defendant's contention that his right to *Miranda* warnings attached "at the very outset of his encounter with the agents." Order at 5. The court went on to hold that, under the totality of the circumstances, defendant's consent to

relinquish evidence was involuntarily given. *Id.* at 5. To reiterate those circumstances, defendant was first confronted by the agents who, in the presence of Felicia Miller (who was in custody at the time, had been advised of her *Miranda* rights, and had already told the agents that defendant was involved the crime charged), showed defendant a photograph implicating him in the crime, and told defendant that they intended to search his residence by means of either a warrant or consent. Defendant went inside and got his father, the owner of the premises, who eventually gave his consent to search defendant's room. While Agents Skinner and Slotter conducted the search, defendant got in his car and left the premises for a brief time. Upon his return, defendant was questioned by Agents Skinner and Kogut; also present at the scene were Agents Burbridge and Slotter. After encouragement from his father, defendant agreed to take the agents to where the money was hidden, and defendant was then handcuffed and placed in the agents' vehicle for the trip to Grider Street to retrieve the money.

■ The court's June 12 order held that defendant was in custody for the purposes of *Miranda* "from the moment he was handcuffed and placed in the agents' vehicle". Order at 5. However, it is clear to the court upon reconsideration that the totality of the circumstances as outlined above amounted to a continuous chain of events requiring a finding that a custodial situation existed. That chain was not broken by defendant's brief departure from the scene, nor by defendant's consent to take the agents to retrieve the money. While characterized by the government as a "consent to search," and thus "not the type of incriminating statement toward which the fifth amendment is directed," *United States v. Lemon*, 550 F.2d 467, 472 (9th Cir.1977), the actions of defendant, in light of the unusual circumstances involved in this case, might also be properly viewed

the third party consent of Ronald Miller, that search uncovered no evidence, and it was not until after defendant's *Miranda* rights attached that he indicated that the television and VCR were purchased with money taken from the

ATMs. Thus, Ronald Miller's earlier consent was vitiated by the taint of defendant's illegal detention, and the television and VCR are not admissible.

as a confession (which has been defined as "amounting to a declaration of defendant's intentional participation in a criminal act," *see California v. Beheler,* 463 U.S. 1121, 1127, 103 S.Ct. 3517, 3521, 77 L.Ed.2d 1275 (1983) (Stevens, J., dissenting) (quoting *People v. McClary,* 20 Cal.3d 218, 230, 571 P.2d 620, 627 (1977), *cited in* App. to Pet for Cert. at 36–37)), to which the *Miranda* analysis undoubtedly applies. *See, e.g., Huckelbury v. Wainwright,* 781 F.2d 1544, 1545 (11th Cir.1986). In any event, the circumstances presented to the court are not those of the usual "consent to search" case, and a substantial question remains as to whether defendant's actions were the type of "words, gesture[s], or conduct" found in some cases to constitute such consent. *United States v. Griffin,* 530 F.2d 739, 742 (7th Cir.1976). When the agents told him that they "wanted the money" (Item 7 [Hearing Transcript], p. 19), defendant responded by agreeing to take them to the money rather than by telling them where the money was hidden. That response was less verbal than it was a course of conduct which continued throughout the time defendant was handcuffed, placed in the police vehicle, and transported to and from the Grider Street address. Thus, the totality of the facts, testimony, and arguments presented to the court require a finding that defendant's actions took place under circumstances amounting to a custodial situation, and therefore, *Miranda* warnings should have been given before any statements, or evidence inextricably connected with and derived from those statements, could properly be obtained. The government's request to reverse the June 12 order insofar as it pertains to the exclusion of the bag of money is denied.

The court has also considered the government's further argument that the statements made by defendant during the ride back to the East Amherst Street residence should be admissible since they were not the product of interrogation, as well as the argument that the $270.00 cash and the receipts for the car, TV, and VCR should be admissible since they were relinquished voluntarily. The court finds insufficient merit in those arguments to override the June 12 order.

The court also declines to reverse that order as it pertains to the written statements made by defendant on December 15 after being advised of his *Miranda* rights, since the making of those statements was not "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416–17, 9 L.Ed.2d 441 (1963). Upon reconsideration, however, it appears that the statements made by defendant on the next day (December 16)[1] were obtained pursuant to defendant's voluntary and knowing waiver of his *Miranda* rights after he was further advised of those rights, and thus those statements are admissible under the holding of *Oregon v. Elstad,* 470 U.S. 298, 318, 105 S.Ct. 1285, 1297, 84 L.Ed.2d 222 (1985). Accordingly, the government's request for reconsideration and reversal is granted insofar as it pertains to the statements made by defendant on December 16, 1988.

So ordered.

---

1. The court accepts the government's representation that the statements made by defendant on December 16 were recorded and made part of the instant record as Government Exhibit 8. *See* Item 7 [Hearing Transcript], pp. 29–30.