Filed 11/4/14  P. v. Hernandez CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B249653 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA097343) |
| v. | |
| JOEL RENTERIA HERNANDEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Bruce F. Marrs, Judge.  Affirmed.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson and Carl N. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Joel Hernandez was convicted of several sexual offenses against his stepdaughter. On appeal, he contends that the admissions he made during interrogation should have been suppressed and that there was no substantial evidence to support one of the convictions. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Hernandez was charged with four sexual crimes against Brenda Doe:[1] (1) continuous sexual abuse (Pen. Code,[2] § 288.5, subd. (a)); (2) aggravated sexual assault on a child (§ 269, subd. (a)(1)); (3) forcible lewd act on a child (§ 288, subd. (b)(1)); and (4) lewd act on a child (§ 288, subd. (a)).) Prior to trial, Hernandez unsuccessfully moved to suppress statements he made during interrogation on the grounds that the *Miranda*[3] warning given to him was deficient and that his statements were involuntary.

Hernandez was convicted of continuous sexual abuse, a forcible lewd act on a child, and a lewd act on a child. The jury deadlocked on the aggravated sexual assault charge; the court declared a mistrial, then dismissed that count. Hernandez was sentenced to 26 years in prison. He appeals.

**DISCUSSION**

**I.      Admissions to Police**

On appeal, Hernandez contends that the statements he made during questioning after his arrest should have been suppressed for two reasons: first, because Hernandez did not knowingly and intelligently waive his rights; and second, because his statement was not voluntary, having been induced by deceptive and coercive tactics. Hernandez

---

[1]      The trial court ordered that she be referred to as Brenda Doe to protect her privacy. (Pen. Code, § 293.5.) We follow this convention.

[2]      Unless otherwise indicated, all further statutory references are to the Penal Code.

[3]      *Miranda v. Arizona* (1966) 384 U.S. 436.

did not argue in the trial court that he had not made an intelligent and knowing waiver of his rights: instead, he argued that the statements should be ruled inadmissible because the *Miranda* warning was improperly translated into Spanish and because the statement was involuntary due to implied threats. "[U]nless a defendant asserts in the trial court a specific ground for suppression of his or her statements to police under *Miranda*, that ground is forfeited on appeal, even if the defendant asserted other arguments under the same decision." (*People v. Polk* (2010) 190 Cal.App.4th 1183, 1194; see also *People v. Rundle* (2008) 43 Cal.4th 76, 120-121, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Hernandez therefore failed to preserve for appeal the question of whether he expressly or impliedly gave a knowing and intelligent waiver of his rights when he failed to challenge the admission of his statements on this ground in the trial court.

We therefore consider the argument that was raised in the trial court and preserved for appeal: Hernandez's contention that his statement was involuntary because it was induced by deceptive and coercive law enforcement tactics. Due process "precludes the admission of any involuntary statement obtained from a criminal suspect through state compulsion." (*People v. DePriest* (2007) 42 Cal.4th 1, 34.) "'A finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions. [Citation.] A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence. [Citation.] Although coercive police activity is a necessary predicate to establish an involuntary confession, it "does not itself compel a finding that a resulting confession is involuntary." [Citation.] The statement and the inducement must be causally linked. [Citation.]' [Citation.]" (*People v. McWhorter* (2009) 47 Cal.4th 318, 347.)

In determining whether a confession was voluntary, the question is whether defendant's choice to confess was not essentially free because his or her will was overborne. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1086.) Whether the confession was voluntary depends upon the totality of the circumstances. (*Ibid*.) On review of the

3

denial of a suppression motion, "'"'"we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.'"'" [Citations.] Where, as was the case here, an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review. [Citation.]" (*People v. Duff* (2014) 58 Cal.4th 527, 551.)

A.  Interrogation

Hernandez was interviewed by Detective Jimmie Pitts after his arrest, with Officer G. Cuevas serving as a Spanish translator.  The interview took place late at night. Repeatedly during the questioning, Pitts impressed upon Hernandez that it was his job to find out the truth, that he wanted the truth, and that he would find out the truth.  He began the questioning with questions about Hernandez's name, family, occupation, and a prior court matter that resulted in an outstanding warrant, weaving in *Miranda* advisements among the questions.  Through Cuevas Pitts then told Hernandez that he had spoken to his family and that he thought that "something happened" in 2008 but that "it wasn't a big deal."  He assured Hernandez that everyone makes mistakes, himself included, and that "if you made a small mistake, you should pay for a small mistake.  [¶] . . . [¶]  You should not pay for a big mistake if you only made a small one."  Cuevas translated Pitts's words as, "If you did [] a small mistake, you have to pay for a small mistake.  [¶] . . . [¶] You shouldn't have to pay for a big mistake if you only  . . . committed something small."

Pitts showed Hernandez a photo of Doe and asserted as translated by Cuevas, "Something happened between you and Brenda."  Pitts continued that what happened was "not that big of a deal.  [¶] . . . [¶]  Okay.  But now's the time we need to find the truth and clear the air and get this over with."  Cuevas translated Pitts's statement as, "It's not a big deal.  [¶] . . . [¶]  But now is the time, now is the time to tell the truth."

4

Pitts told Hernandez that Doe had said that Hernandez treated her family and herself very well, but that a few years ago Hernandez touched her in an inappropriate manner. Hernandez responded, "That's not true." Pitts told Hernandez that Doe said the touching happened a few times. He told Hernandez he understood, and asked if Doe had been flirting with him. He asked Hernandez to help him understand. Hernandez told Pitts that he had once spanked Doe while they were playing. Pitts said that they already knew about that, and it was not what they were talking about today. Pitts said that Doe alleged that Hernandez had touched her buttocks on the outside of her clothes, and that Hernandez's wife had confirmed that Doe reported this to her. Hernandez denied touching Doe.

Pitts talked with Hernandez about a 2008 police investigation into inappropriate contact with Doe, telling Hernandez that his wife had now admitted that she was lying when she said nothing had happened. Pitts told Hernandez that his wife was saying that he had touched Doe two or three times but that she had told Doe to lie to the police and social worker when they investigated. Pitts said, "Now, I understand and we all make mistakes," translated by Cuevas as, "He understands, comprehends. [¶] . . . [¶] And understands that we all do[] mistakes." Pitts asked if Doe had done something to provoke Hernandez. Hernandez denied provocation and said that the only time he touched her was when he spanked her buttocks. Pitts told Hernandez they were not talking about the spanking, they were talking about the time when he touched Doe sexually in 2007 or 2008. Hernandez again denied touching Doe.

Pitts told Hernandez it was strange that Doe would tell her mother about this, that her mother would confront him, that a second child in the house would report having heard the confrontation, and that they all would have the same story. Pitts asked again what happened. "Nothing. I have never touched her. It's not like I'm going to say yes, when I haven't . . . touched her. Why would I blame myself?" responded Hernandez. Pitts told Hernandez that he did not understand why everyone else would lie. Hernandez asked Cuevas, "What is it that I . . . he wants me to tell him?" Cuevas answered, without consulting Pitts, "The truth." "That I touched her?" asked Hernandez. Cuevas translated

5

to Pitts that Hernandez was asking "what do you want him to tell you," and Pitts responded, "Just the truth."

Pitts asked a series of questions tending to paint Doe as having been sexually attracted to Hernandez or attempting to seduce him. Pitts said, "[M]an to man," and "She's not your daughter. [¶] . . . [¶] She's your stepdaughter." He observed that Doe was pretty. Pitts suggested that perhaps Hernandez had been drinking or that he and his wife might have been arguing or not having sexual relations, and observed that there were many reasons that could have led Hernandez to do something like this. He suggested that Doe might have been attracted to him (although this was mistranslated by Cuevas as Hernandez being attracted to Doe), and that perhaps Doe thought of him in a way other than as a father. Pitts lied that when he talked to Doe, she said that she would deliberately walk through the house in a towel after she showered so that he would see her.[4] Pitts said he was curious and wanted to know if she had done something or if Hernandez was drinking. Hernandez again denied that he had ever touched Doe.

Pitts told Hernandez that he thought he knew the truth but that they were going to find out the truth, sentences translated by Cuevas as, "He says that he already knows the truth." Pitts told Hernandez that it would be better for him and his family if he was honest. Pitts said that if Hernandez did not touch Doe then when he (Pitts) finished his investigation he would know that and could prove that he did not touch her. But if Hernandez did touch Doe, Pitts would find out because his investigation would be thorough. Pitts said, "If something happened, I would rather hear the truth from you now, so I get your side of what happened, than for you to lie and me to find out the other way." Cuevas translated this as, "If something happened, he prefers to get the truth from

---

**4** Pitts made clear in his trial testimony that Doe never said she had worn a towel so that Hernandez would see her. Pitts explained that "it's common in a child molestation case, when a person is accused of similar crimes, that we try and minimize it or try and shift blame to the victim, which I know is hard to understand[,] to think that I would sit there and say that this seven-, eight-, or nine-year-old girl wanted something bad to happen to her. But this is the world that I live in and have to deal with to try to get people to tell the truth."

6

you rather than when he gets other people's story. So it's best that you tell the truth, instead of other people. To get the side of, the side of the story that you have to tell."

Pitts reminded Hernandez again that everyone makes mistakes, and asked him how people recover from mistakes. Pitts said, "By admitting that we've done wrong," but before Cuevas translated this sentence, Hernandez said, "Actually, one day I was drunk. And I mean, I did, I did try to touch her, but I didn't touch her. I did try. And yes, that time I was drunk." Hernandez continued, "But I didn't, didn't touch her, but I did try, yes . . . ." Hernandez then told the police that he had been drinking and that he had gone into Doe's bedroom to look at her while she was sleeping. She awoke. Hernandez denied touching Doe but admitted that he was thinking about her. When asked if those thoughts were sexual, Hernandez first said that he was drunk and then that he did not know what he was thinking. Pitts asked if it was possible that he touched Doe when he was drunk, and Hernandez said that he had not touched her.

Pitts tried a new tack, telling Hernandez that if he did touch Doe sexually a few times, "It happened, it's not good, but it's not a big deal. It's a mistake." Cuevas translated this statement as, "[I]t happened, it's not good that it happened [¶] . . . [¶] but it's not a big thing either." "If that's all," Pitts continued, "then fine and we close this out," which Cuevas translated as, "it's fine and the case can be closed." Pitts told Hernandez that he might get in a little bit of trouble, but he was not a bad person; he just made a mistake. Pitts cautioned Hernandez that if he did not get the truth from Hernandez, he would have to continue investigating until he found the truth. "It's better for you, if you made a little mistake, tell me now," said Pitts; Cuevas translated this as "It's better for you, that you did a small mistake, to say it." Telling them would be better for Hernandez's family as well, Pitts told him. Pitts told Hernandez that if he did make a mistake he would feel better if he told the officers. "What happened?" Pitts asked again. Hernandez said, "I don't know. I don't know what, what you're asking me about."

Pitts told Hernandez that Doe was very clear that Hernandez had touched her two or three times. "Her private part?" asked Hernandez. Cuevas responded affirmatively. Hernandez had touched Doe's private parts in 2007 or 2008, Pitts told Hernandez.

7

Hernandez said, "No." Pitts asked when it was that Hernandez had gone into a sleeping Doe's bedroom, and Hernandez said it was around 2008. Pitts asked if Hernandez thought that this was what Doe was talking about. Hernandez said yes.

The officers took a break and brought Hernandez water. Afterwards, Pitts told Hernandez that he only wanted the truth, that everyone makes mistakes, and that "it's gonna be a lot easier for you and your family [¶] . . . [¶] if you just come forward with the truth." Cuevas translated this as, "[I]t's going to be much easier for you and for your family [¶] . . . [¶] if you just tell the truth." Pitts reminded Hernandez that he first denied anything ever happened with Doe, but that he had now told them about a time when he was drunk and went into her room to look at her. "You're starting to be honest," Pitts told him. "And that's all we want."

Pitts asked where Doe was when Hernandez touched her, and Hernandez responded that he had not touched her. Pitts asked how Doe could have known he was looking at her if she was asleep. Hernandez said she awoke but nothing happened. Pitts suggested that maybe Doe had misinterpreted Hernandez's actions, but Hernandez said that while he did make a mistake by going into her room to look at her, he did not touch her.

Pitts then told Hernandez that Doe had responded in the negative to the officers' questions about whether Hernandez had raped her, forced her to have oral sex, and other specific sexual acts. He said that Doe said only that two or three times Hernandez had grabbed her and rubbed her, making her feel strange, and reminded Hernandez that this was what had been reported to the police in 2008. The case would have been over, Pitts told Hernandez, if it were not for Hernandez's wife having told Doe at that time to lie to the police.

Pitts asked Hernandez if he understood the difference between a felony and a misdemeanor, which Cuevas translated as a "big crime" and a "small crime." Hernandez said he did not. Pitts said that rape and child molestation were felonies, and Cuevas told Hernandez that a felony was "like a rape." Pitts said that the touching Doe alleged was a misdemeanor. Hernandez said, "I'm very regretful about that." Without translating

8

Hernandez's words into English for Pitts, Cuevas asked Hernandez what he regretted. Hernandez said he regretted going in to Doe's room to look at her. Hernandez again maintained that he had never touched her private parts or her body without clothes, and that the only time he had touched her with clothes was the spanking he had told them about. He related that the spanking had caused his wife to be very upset and that they had a big argument.

Pitts told Hernandez that he was going to get to the truth. He told Pitts to come with him, and took him out of the interview room. Pitts told Hernandez to look at a machine in a nearby room. The men returned to the interview room, and Pitts told Hernandez that what he had just seen was the room where they did lie detector tests, or, as Cuevas translated it, "There where that machine is, we use it to connect you to the machine, and the machine detects when you're lying." The polygraph operator, Pitts told Hernandez, would be there in the morning, and tomorrow they could hook him up to the machine. "And there we'll see if you're lying or not," Cuevas translated for Pitts. "But if they get to that extreme," Cuevas translated, "there are going to be more problems for you if you're lying." Pitts said he would bring Doe in the following day as well to test her.

Pitts asked Hernandez whether they needed to do all that, or whether he would tell them what really happened. Hernandez protested that he did not rape Doe, nor did he touch her private parts. Pitts told him that they knew he did not rape her. "You had some thoughts," Pitts said through Cuevas. "You touched her. [¶] . . . [¶] It was wrong. [¶] . . . [¶] You know it was wrong. [¶] . . . [¶] That's all you did." "I think this is the truth," Pitts said. "I hope we don't find out more tomorrow," said Pitts; Cuevas translated this as, "He says he hopes that when, when you're hooked up to the machine, other things won't come up, while you're connected to the machine."

"What happened?" Pitts asked again. Hernandez repeated that he had spanked Doe on the buttocks once and that he had gone into her bedroom to look at her. Pitts questioned Hernandez about his thoughts while watching her, and Hernandez denied that he had ever thought about raping her. Hernandez said he knew that it was wrong to have

9

gone to look at her, and Pitts asked why it was wrong. Pitts pointed out that there's nothing wrong when he (Pitts) checked on his son at night. "But that's not, that's not what you did," Cuevas translated for Pitts. "Is it?" asked Pitts, which Cuevas translated as, "Right?" "No," said Hernandez. Pitts asked why Hernandez looked at her, and Cuevas then added, "With what intention did you look at her?" After a few more questions, Hernandez said yes to Cuevas's statement, "But you went to look at her with not very proper intentions." He said he went into Doe's room to look at her because she was pretty, but that it never crossed his mind to do her any harm. Pitts assured him that he had not done her any harm and that he had not hurt her.

Pitts then said, "Do you understand that if you did something wrong, it's better to tell me now, than to get caught lying tomorrow?" Cuevas translated this as, "He wants you to understand that it's much better for you . . . [¶] . . . [¶] . . . to tell the truth right now, than it will be tomorrow when you're hooked up to the machine and are caught lying. It will be worse for you. He wants, he wants you to understand that." Hernandez confirmed he understood. Pitts then said he would ask him the questions that would be asked by the detective the following day during the lie detector test. Pitts said that he had hoped they would not have to use the machine. Pitts asked a series of questions about whether Hernandez had sexually abused Doe in a number of very specific ways.

Pitts then asked if there was anything else Hernandez wanted to tell them. Hernandez said no. "If anything else happened, different from the answers you just gave me to those questions, now is the time to tell me," Pitts told him. "What did he say?" Hernandez asked Cuevas. Cuevas responded, "If any of the questions you were asked right now, the answers you gave, are different from the ones you gave. Right now is the time to change your answers." "Right now," Cuevas continued, "is the time to tell the truth."

After a pause, Hernandez said, "Did she say that I touched her?" "Yes," Cuevas said, Doe said he had done so two or three times. "I don't understand why," Hernandez said. Pitts told Hernandez he would schedule Doe on the polygraph machine in the morning, that he would speak to a few more people after that exam, and that then it

10

would be "time for your exam," which Cuevas translated as, "And then it'll be you . . . you'll go and get connected to the machine."

Pitts told Hernandez that there would be "no problem" if he was telling the truth but that if he was lying, that it would be very bad for him. There was a pause, then Pitts asked if there was anything else he wanted to say before they finished. Cuevas translated Pitts's statement and then added, "Last chance. There won't always be an officer here that can speak Spanish." Hernandez asked, "Is that it?" Cuevas answered, "The machine will tell us the truth any[]way. But it's much better for you . . . to not go that far. You do understand what I'm trying to tell you?" "I know," Hernandez answered. "Because once you're on the machine," Cuevas continued, "other things can come up." "They're asking you about one thing right now, but once you're over there, other things can come up that . . . can cause you even more problems." Hernandez said, "I know." Cuevas said, "So, this is why he wants . . . to ask you about the touching, that's it. Do you want to talk about that? It's the last—Because he's finishing up." "Okay, I tried touching her once," Hernandez said. Hernandez then related an incident in which Doe was in the bathtub and he attempted to touch her vagina.

After further questioning about this incident, Pitts told Hernandez, "We're doing good," which Cuevas translated as, "He says you're, you're doing good." Cuevas added, "You're doing the right thing." Pitts told Hernandez he was going to tell him something in a moment would make him relieved, although Cuevas translated it as something that would make him relax. But first, Pitts said, he knew that Hernandez was "down-playing" what had happened, which Cuevas translated as "you're saying it in a way that didn't happen much." Pitts ran through the events as Hernandez had described them, and then said that he (Pitts) thought Hernandez probably had touched Doe's private parts. Hernandez denied touching her vagina but admitted looking at it.

Pitts then explained that Hernandez would not be released that night because of an outstanding warrant but that he would sleep better that night than he had in years because he had gotten this off his chest. Hernandez said that at times he had considered turning himself in because he felt so bad about what he had done. Pitts asked if he felt better

11

now, and he responded, "Well, yes. It's years of feeling like I was choking and . . . sometimes I just wanted to disappear from here and never see them . . . but my children would hold me back."

Pitts told Hernandez he appreciated his honesty. He said that now Hernandez had told them about one of the two times that Doe had told them about, and asked what the other time was so that they could finish this. Hernandez said that the spank to Doe's buttocks was the only other incident. "That's not the second incident," Pitts told him through Cuevas. Maybe the other time Doe was talking about was when he went into her bedroom, Hernandez suggested; although he had not touched her that time perhaps she thought he had done so, he told the officers. Pitts asked a series of questions about the bedroom visit, but Hernandez maintained that he had not touched her.

Pitts then asked when was the second time that Hernandez touched Doe. Hernandez paused and said, "No." Cuevas said, "There were two, three incidents . . . that she was touched. You're telling us two. There's one left." Hernandez said, "That's it . . . it's what I've told you, that's it." "That's it?" asked Cuevas. "Yes," said Hernandez, and several times more denied any further incidents. Hernandez said, "That's it. Honestly, yes. That's it, because, no, no . . . . That's it. And yes, I feel much better because yes . . . I mean, that's what had me . . . ." Hernandez continued, "But if she said two or three . . . that I've touched her three times, that's . . . I don't know. I honestly . . . really . . . ."

The officers again ran through the bathtub incident, the night he went in and looked at Doe, and the time he spanked her. Pitts asked Hernandez whether he felt better, and he said he did. Pitts told him he would sleep better that night. Hernandez expressed concern for his children and how his family would manage because they depended on his income. Cuevas reassured Hernandez that the crime he described was a minor crime. Pitts asked if there was anything else he would like to tell them, and Hernandez said that was all. Hernandez said he knew it was not right and that it was wrong. Cuevas told him, "It's not good but it's not like . . . a big crime." Pitts agreed in Spanish, saying "That's true." They spoke some more, and Pitts told Hernandez he was very happy that

12

Hernandez told the truth. He told Hernandez it would be better for him, that he made a small mistake, he would pay in a small way, and that he and his family could then move forward. The officers left Hernandez with paper and pen to write a note to his family if he so desired, and then ended the questioning.

B.  Trial Court Ruling on the Motion to Suppress

After hearing argument on the motion to suppress, the trial court said, "No big deal. Small crime. Lie detector. Problems if the machine shows other things can come out[,] which, of course, is totally true. Defendant wasn't told of his right of refusal. I don't believe that's constitutionally required, or even case law required during an investigation and the interview. [¶] I love the fact that you folks brought in the [*People v.*] *Mays* case at [(2009)] 174 Cal.App.4th 156. The *Mays* case runs through a huge litany of various cases where officers had misrepresented or made omissions with various defendants that were upheld. Police officers are at liberty to utilize deceptive strategies to trick a guilty person into confessing, such as accomplice has been captured and confessed. Officer implied he could prove more than he really could. Officers lied, insisting they had evidence linking the suspect to a homicide. Told wounded suspect he might die before he reached the hospital so he should talk while he still had the chance. Gun residue test producing positive result. Fingerprints in the car, although no fingerprints had been obtained. The one I particularly love was *People versus Smith* at [(2007)] 40 Cal.4[th] 483. 'It was not impermissibly coercive for a police officer to tell the defendant that a "neutron/proton negligence intelligence test," indicated he had recently fired a gun. Additionally, the sham did not elicit a full confession, but only incriminating statements,' much analogous to what we had here. [¶] The key test is whether or not the will of the defendant was overborne and that it was, in fact, voluntary, that is, a free and deliberate choice; was not so coercive as to be unconstitutional and under circumstances that a false confession would be likely. [¶] Since we didn't get a full confession in this particular case—we got statements that may or may not be admissions depending on whether the jury believes them or not—I don't think that we

13

have a situation where the extent of big deal versus small crime is so inherently coercive as to require suppression of the entire statement. [¶] Motion to suppress on that [involuntariness due to coercion] ground will also be denied."

C. Arguments on Appeal

Hernandez argues that he ultimately made admissions "only after the coercive tactics by Pitts and Cuevas convinced [him] that a confession represented his only hope for leniency." Leading a defendant to believe that he or she might reasonably expect lenient treatment by the police, prosecutor, or court if he makes a statement renders that statement involuntary and inadmissible. (*People v. McClary* (1977) 20 Cal.3d 218, 228, overruled on other grounds in *People v. Cahill* (1993) 5 Cal.4th 478, 510, fn. 17.) Hernandez, however, does not identify any specific statements during the questioning that purportedly communicated to Hernandez that he would receive leniency in exchange for a confession, nor did we identify in our review of the interrogation footage or in the nearly 200-page-long transcript any express or implied promises of leniency in exchange for a confession. While the officers pressured Hernandez to tell them the truth and told him that lying would make the situation worse, at no time did they promise him anything, expressly or impliedly, other than the relief that comes from telling the truth and addressing any crimes he had committed. "Absent improper threats or promises, law enforcement officers are permitted to urge that it would be better to tell the truth." (*People v. Williams* (2010) 49 Cal.4th 405, 444 (*Williams*); see also *People v. Carrington* (2009) 47 Cal.4th 145, 172 ["when law enforcement officers describe the moral or psychological advantages to the accused of telling the truth, no implication of leniency or favorable treatment at the hands of the authorities arises"]; *People v. Green* (1987) 189 Cal.App.3d 685, 694 [telling defendant that interview was a way of "getting this thing straightened out" was no more than an exhortation to tell the truth].) Hernandez, moreover, demonstrated that his will was not overborne by the officers' tactics: he never confessed to sexually touching Doe despite the officers' extensive efforts to get him to admit that he had. He admitted to once spanking her over her clothes, to once attempting

14

to touch her vagina but not succeeding, and to watching her with improper thoughts once while she slept; presumably if he had believed that he needed to confess to obtain leniency he would have agreed with the officers' repeated assertions that he touched her sexually.

Next, Hernandez charges that the officers improperly "cozied up" to him as in *People v. Flores* (1983) 144 Cal.App.3d 459, 466. Not only is it not "inherently coercive for an interrogator to attempt to form a rapport with the suspect" (*Williams*, *supra*, 49 Cal.4th at p. 447), but the conviction in *Flores* was ruled inadmissible not because the officers acted sympathetic to the defendant and suggested that the victim of the crime was a bad person, but because they threatened the defendant with the death penalty combined with the implicit promises that only by confessing to involvement in the victim's death could he avoid the death penalty and that he might be released from custody until trial if he confessed. (*Flores*, at pp. 471-472.) Hernandez argues that the interrogation here was similar to that in *Flores* because "Pitts told appellant that he was only being accused of a misdemeanor, it was no 'big deal,' and that admitting everything would be a lot less serious than if the lie detector established he wasn't telling the truth." Although Hernandez did not discuss the cases further, it appears that he equates this case with *Flores* by suggesting that the officers' minimization of the offenses constituted an implicit promise of leniency as in *Flores* and the threat that things could go worse after a lie detector test was a threat akin to that in *Flores*, but neither characterization is supported by the record here. While Pitts and Cuevas dramatically minimized Hernandez's conduct, they never suggested that there was any leniency available: they repeatedly discussed that punishments would be commensurate with the crimes, so that if Hernandez committed a small crime he would pay in a small way, while if he committed a greater crime the consequence would be greater. As we discussed above, the officers' exhortations to tell the truth and to tell them what happened were not accompanied by any promises of leniency. With respect to lie detector test, Hernandez was told that it would be worse for him if the lie detector test established that he was not telling the truth because "other things" could come up during such an examination. Moreover, it is not

improper to point out that demonstrably false denials will not benefit a defendant. (*Williams*, *supra*, 49 Cal.4th at p. 444 ["there is nothing improper in pointing out that a jury probably will be more favorably impressed by a confession and a show of remorse than by demonstrably false denials. 'No constitutional principle forbids the suggestion by authorities that it is worse for a defendant to lie in light of overwhelming incriminating evidence.' [Citation]"].) The record here simply does not support a comparison to the involuntary confession in *Flores*.

Hernandez next argues that deception by Pitts and Cuevas proximately caused him to confess. He asserts that the officers' behavior led directly to his incriminating statements, because "he was told he would be facing far more serious charges the following day if the lie detector test established he was being untruthful. He was not informed that he had the right to refuse to even participate in the lie detector test, but simply that things would go much worse for him after the test if he was not truthful during the initial interrogation. He was flatly told that the current allegations were minor, but could be elevated to felonies if he was not truthful." Hernandez does not identify any pages in the nearly 200 pages of transcript to support these factual allegations, and we found no such threats in the record. It was clear from the context of the lie detector discussion that the officers had advised Hernandez that if they performed a lie detector test, other conduct could come to light that would result in more serious problems for him. As the trial court noted, the assertion that Hernandez's problems could become more severe if other information came to light was completely accurate. Hernandez was not informed he could refuse a polygraph, but he has not identified any legal requirement that the police advise him of his right to refusal of a future polygraph exam in this context. We found no statement or suggestion by the officers in the record that his charges would be elevated to felonies if he lied to the police, and Hernandez does not identify any passage in the very long transcript that would support this claim. Finally, the record does not support Hernandez's contention that the officers' conduct proximately caused him to confess, for although he made incriminating statements, he steadfastly refused to admit to sexually touching Doe.

16

Based on our review of the filmed interrogation, we conclude that Hernandez's will was not overborne, that the incriminating statements he made were voluntary and the result of a free and deliberate choice, and that the police tactics here were not so coercive as to be unconstitutional or to create circumstances in which a false confession would be likely. The motion to suppress was properly denied on this ground.

## II. Sufficiency of the Evidence on Count Four

In the second amended information, count four alleged that Hernandez committed a lewd act on Doe during a time span that corresponded with the year that Doe was seven years old. Hernandez contends that no reasonable jury could have concluded beyond a reasonable doubt that any touching occurred while Doe was seven years old.

At the 2013 trial Doe, then 16 years old, gave somewhat conflicting statements about when the sexual abuse began. Initially, she related that she was not "exactly really sure when it started," and that she was "like 8" years old when the touching began. She reported that she was "not sure . . . when the first time was," but that he would touch her buttocks as he walked past him in the hallway or approach her from behind in the kitchen. "Did this happen to you when you were as young as 7?" the prosecutor asked. "No," said Doe. "I didn't live with him at that age." Doe stated the touching had begun "roughly about a month after" her family and Hernandez began living together.

Later in Doe's testimony the prosecutor questioned her about information she had told the police in 2012. When the prosecutor asked her what she had told the police at that time, she testified that she had described the abuse as starting when she was seven or eight years old. The prosecutor asked her if this information was correct. Doe responded that this information was correct, because the touching "started when I had moved in with my stepfather, which is when I was 7 about to be 8." The touching, she testified, started "right away."

While the evidence was in conflict, it was sufficient to support the verdict on count 4. "When a jury's verdict is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the

17

determination as to whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, which will support it, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the jury.  It is of no consequence that the jury believing other evidence, or drawing different inferences, might have reached a contrary conclusion." (*People v. Brown* (1984) 150 Cal.App.3d 968, 970.)  On this evidence, if the jury believed that Hernandez abused Doe, the jury could have concluded that the abuse began when Doe was seven, or it could have determined that it began when she was eight.  The jury concluded that the abuse began when she was seven years old, and substantial evidence supports that determination.

## DISPOSITION

The judgment is affirmed.

ZELON, J.

We concur:

WOODS, Acting P. J.

SEGAL, J.[*]

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.