Filed 12/23/25  P. v. Cervantes CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MIGUEL ANDREZ CERVANTES,<br><br>    Defendant and Appellant. | F087954<br><br>(Super. Ct. No. BF192648A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Timothy E. Warriner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Ivan P. Marrs and Caely E. Fallini, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendant Miguel Andrez Cervantes was convicted of second degree murder after stabbing Jesse M.[1] with a kitchen knife in a store parking lot. Serving prison time on other charges, defendant made un-*Mirandized*[2] and inculpatory statements during an interview with homicide detectives, which were admitted at trial. The trial court sentenced defendant to a term of 15 years to life in prison, plus one year. Defendant appeals and argues that the trial court erred in admitting his statements to detectives into evidence because the custodial interview was not preceded with advisement of his *Miranda* warnings and his statements were involuntary and coerced. Additionally, defendant argues that the trial court erred in failing to instruct the jury regarding voluntary manslaughter as a lesser included offense under theories of imperfect self-defense and heat of passion.

We affirm the judgment.

# PROCEDURAL BACKGROUND

The District Attorney of Kern County filed an information on May 19, 2023, charging defendant with murder (§ 187, subd. (a)) and alleging the murder was committed with premeditation and deliberation, defendant personally used a deadly weapon (§ 12022, subd. (b)(1)), and aggravating sentencing factors (Cal. Rules of Court, rule 4.421(a)(1), (2), (8) & (b)(1)–(5)). Defendant pleaded not guilty and denied the allegations.

On January 8, 2024, defendant moved for an evidentiary hearing to exclude his statements to detectives, arguing that his statement was un-*Mirandized* and involuntary. After the hearing, the trial court denied defendant's motion to exclude the evidence and

---

[1]     Pursuant to California Rules of Court, rule 8.90, we refer to certain persons by their first names and/or initials. No disrespect is intended.

[2]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

2.

concluded that defendant was not in custody for purposes of *Miranda* warnings and his statements were neither involuntary nor coerced.

The jury convicted defendant of second degree murder, acquitted him of first degree murder, and found true that he used a deadly weapon. Defendant waived a trial on the aggravated sentencing factors, and the trial court found all but one factor to be true. On April 24, 2024, the trial court sentenced defendant to a term of 15 years to life in prison, plus one year (§ 12022, subd. (b)(1)),[3] and ordered defendant to pay victim restitution (§ 1202.4, subd. (f)), $300 restitution and parole revocation restitution fines (§§ 1202.4, subd. (b), 1202.45), a $40 court operations assessment (§ 1465.8), and a $30 criminal conviction assessment (Gov. Code, § 70373).

Defendant filed a timely appeal on April 25, 2024.

## FACTS

Fourteen-year-old T.M. accompanied her father, Jesse, to the store on the evening of August 29, 2021. As they parked, T.M. saw defendant approaching various vehicles, and Jesse suggested that he should ask if defendant was hungry. Defendant walked past, and Jesse asked him if he would like something to drink. Jesse went into the store and bought defendant a drink while T.M. waited in the truck. Jesse purchased beer, which he shared with defendant. T.M. then went into the store to buy herself something to drink and saw defendant and Jesse talking amicably near the truck when she returned. T.M. had crackers with her in the truck. Jesse and defendant appeared to be getting know one another and discussing where they lived. T.M. stood near them on the driver's side of the truck. While they spoke, the discussion never turned into an argument.

Jesse pulled out his phone and noticed he had missed a call from T.M.'s brother. He handed it to T.M. and asked her to call her brother back. She turned away for a

---

[3] The abstract of judgment fails to reflect the sentence as to the section 12022, subdivision (b)(1) enhancement. We shall order the superior court clerk to prepare an amended abstract of judgment.

second to do so, and when she turned back around, Jesse was holding his neck and said that he had been stabbed. Although T.M. had not yet made the call to her brother, she turned around because she heard shoes rustling. Defendant had a red knife in his hand and was trying to stab Jesse again. The incident commenced at the rear driver's side of the truck and moved to the front of the truck. T.M. ran to defendant, grabbed his shoulders and threw him to the ground. Defendant dropped his knife when he fell about four feet from the driver's side of the truck.

Defendant told T.M. that he was sorry and thought that Jesse "was tripping on [her]" (was a threat) and "just kept apologizing to [her]." Defendant ran off, and T.M. ran after him before returning to Jesse. Jesse was on the ground trying to breathe, and T.M. tried to get help from inside the store. She called her mother and her brother but finally began screaming for someone to help. She tried to stop Jesse's bleeding and told him not to close his eyes. Jesse tried to speak but was choking.

T.M. never heard defendant threaten Jesse, nor did they argue. T.M. possessed Jesse's black knife while she waited for him in the truck but left it in the truck when she went into the store and did not have it during defendant's attack. She did not give it back to Jesse, and it was in the truck during the incident. T.M. did not recall telling law enforcement that she had found Jesse's knife on the ground, picked it up while chasing after defendant, and that it fell out of her pocket. She also did not recall throwing her backpack at defendant or telling police that she had done so. T.M. identified defendant from a photographic lineup.

Bakersfield Police Detective Jason Perez responded to the store and saw people surrounding a man who was bleeding on the ground. He examined Jesse and saw a dime-sized hole on the left side of his neck spurting blood. Perez also observed a package of crackers, a red-handled knife, and two beer cans near Jesse's truck.

After Jesse was taken to the hospital, Perez spoke with T.M. T.M. told Perez that she had grabbed the suspect by the neck, pushed him to the ground, and kicked and

4.

stomped him before he ran away. She saw Jesse's knife on the ground and put it in her pocket as she ran after the suspect. While running, the knife fell out of her pocket. Other officers retrieved the knife from where it had fallen, and T.M. identified it as Jesse's knife. T.M. told Perez that she was on the other side of the truck when Jesse was stabbed.

Bakersfield Police Detective Keith Schlecht was assigned to investigate Jesse's stabbing a few days after it occurred. Schlecht learned that defendant's DNA had been found on a beer can located at the scene. Using the information, Schlecht prepared a photographic lineup that included defendant's photograph. Schlecht obtained a DNA sample from defendant. During a search of Jesse's truck, Schlecht located a backpack that could have belonged to T.M. but did not find a pocketknife. He also viewed video surveillance from the store's exterior, which captured the incident but did not provide views of faces or the weapon used. Interior cameras showed Jesse purchasing beer and, approximately two minutes thereafter, T.M. entered the store and purchased a drink.

Schlecht interviewed T.M. approximately one week after the incident, and the recording was introduced into evidence. T.M. explained that as they parked at the store, defendant walked by and, while still in the truck, Jesse asked if defendant wanted a drink. Jesse gave T.M. his pocketknife, and she remained in the truck while Jesse left to purchase defendant a drink. Defendant stood near the driver's door, walked around the truck, and she asked him his age and where he was from when he returned.

Jesse returned, gave defendant a beer, and then leaned against the driver's door. T.M. gave defendant some crackers. She sat in the truck while Jesse and defendant spoke about where defendant lived and drank their beers. T.M. then entered the store and purchased a drink. When she returned, she stood near Jesse who was standing with defendant near the driver's door. Jesse handed her his phone and instructed her to call her brother back. She turned away but heard scuffling and, when she turned back, saw Jesse holding his neck. Jesse said defendant had stabbed him. She saw defendant struggling with Jesse who tried to get away and threw his beer at defendant. Jesse was backing up,

5.

and defendant ran at him with the knife still in his hand. T.M. grabbed defendant from behind, threw him to the ground, and stomped on him. Defendant got up and apologized but stated that he thought Jesse was "tripping" on her, meaning that Jesse was threatening or yelling at her.

T.M. described defendant's knife as a kitchen knife with a red handle, which she saw on the ground when defendant fell. Jesse's knife was a black pocketknife that she had returned to him when he came back from the store. T.M. believed that Jesse tried to pull out the knife after he was stabbed but dropped it.

Juan H., approximately 13 years old at the time of the incident, lived near the store and observed the incident from his front yard. Although not certain, he believed that he went outside after hearing a girl scream. He saw a girl running down the middle of the street asking for help and a man jumping the fence across from his house. After retrieving his mother from the house, they called the police.

Juan later testified that he may have been outside already before hearing the screaming. He first heard a commotion he described as "elevated" male voices, then screaming male voices. He saw two men fighting and glimpsed the stabbing. Juan clarified that he used the term "fighting" to refer to a verbal argument and did not remember seeing any physical fighting. When he went outside, Juan glimpsed two men and saw someone falling, but he did not see them engaging physically. He testified that he told officers he had seen a stabbing because, although he did not see Jesse stabbed, he saw the knife and later saw the neck wound. During cross-examination, Juan agreed that he saw a physical altercation before the stabbing but clarified on redirect that he did not see any punching and did not remember any fighting.

Juan did not remember seeing the girl throw a backpack at the man. A few months later, Juan identified defendant from a photographic lineup, but he was only 40 to 50 percent sure.

6.

Officer Bradley Mouser responded to the incident and interviewed Juan. Juan advised him that he heard screaming from outside his residence, went to the front yard, and saw a man running down the street as a girl followed and threw a backpack at him. Although Mouser's report indicates that Juan saw a physical altercation, he did not remember what words Juan actually used. Juan also saw a stabbing. When shown a photographic lineup, Juan stated that he heard a commotion, saw two subjects fighting, and then saw the suspect stab Jesse.

At the hospital, Jesse was resuscitated and taken into surgery where attempts were made to repair the injuries to his jugular vein and carotid artery. However, over the next several days, Jesse's brain slowly died until his heart stopped. The coroner concluded that the cause of death was a stab wound to neck.

Eventually, Schlecht and Perez interviewed defendant. During defendant's interview with Schlecht, he stated that he was high at time and seeing things. He first saw a female who was young, but when she got of the car, she was old and wrinkled like the devil tricked him. When asked why he killed Jesse, defendant explained that Jesse was looking at a low-riding car and laughing, saying it probably had babies in the trunk. Defendant could not understand why Jesse thought the remark was funny and, thinking of his own kids at home, he became triggered. Defendant then said, "We started fighting."[4] When asked, "Who hit who first?" defendant responded, "I hit him first. Um, hit him again, and took out a knife to and he got me … [¶] … [¶] … he stabbed me too." Defendant explained that he did not know if the girl was Jesse's daughter, that he was "tripping out about human trafficking," and he thought Jesse "was pulling something," because defendant was tripping and high. Defendant stated that it was odd that the girl

---

[4] Schlecht testified that he did not clarify defendant's use of the term "fighting" as to whether it was verbal or physical. However, he did clarify that when defendant stated he "hit" Jesse, defendant meant that he stabbed Jesse.

had a backpack that late at night and she should have been at home.  Defendant stated that Jesse stabbed him a few times and T.M. then hit him in the head.

Defendant described the knife that he used to stab Jesse.  When asked why he stabbed Jesse, defendant responded, "[Bec]ause he said that," "[a]bout the kids in the trunk, I mean.  That's what triggered me, and I'm like, aw, it was all good until you said that, aw."  Schlecht asked, "So … when you said you hit him, did you hit and stab him …?"  Defendant replied, "I didn't, I didn't punch him," "[j]ust stabbed."  Defendant's knife was in his pocket when Jesse made the statement about the children, and defendant pulled it out and stabbed Jesse one time.  At that point, T.M. hit him with a backpack over the head, and Jesse stabbed defendant twice after defendant had first stabbed Jesse.  When asked why defendant thought Jesse had stabbed him, defendant responded, "Because he wanted to fight back too."  Defendant stated that he thought Jesse was trying to defend himself and explained, "[Bec]ause I stopped like you know like I [was] walking towards him, whipped out a knife, I'm like, oh …."

Defendant said that Jesse offered him a beer and then "started being an asshole," which made defendant mad.  Another detective asked, "Why didn't you just go and fight him with your hand?  Why did you use a knife?" and then, "Why didn't you just, like, just grab him instead of stabbing him?"  Defendant replied, "I didn't, I just … I just did it, you know?  That's what triggered me, you know?"

Defendant had been knocked down and then got up and ran away.  Defendant was treated for the wounds at a hospital the following day after someone called an ambulance.  He provided a "random name" and said that he had been jumped.  Defendant threw away the clothes and shoes that he had been wearing.

A DNA expert testified that defendant's DNA was identified on a beer can.  He compared a sample of defendant's DNA contained in a database, and Detective Schlecht took another DNA sample during his interview of defendant.  Defendant's DNA could not be excluded as a potential contributor (meaning he contributed his DNA) to two samples

taken from a beer can. Defendant, Jesse, and T.M. contributed to DNA found on the blade of the pocketknife, but defendant was excluded from having contributed to the sample of DNA found on the red-handled knife.

Defendant told Schlecht and Perez that he received medical treatment as the result of stab wounds he received from Jesse and provided a false name when doing so. Perez found the hospital records of defendant's treatment for a stab wound under a false name.

## DISCUSSION

### I. *The trial court did not err in denying defendant's motion to exclude his statement to law enforcement.*

Defendant argues that the trial court erred in ruling that he was not in custody and entitled to advisements pursuant to *Miranda*, *supra*, 384 U.S. 436 before he was interviewed by detectives. He also argues that his statement was inadmissible because it was not voluntary. We reject both arguments.

#### A. Background

Defendant requested an evidentiary hearing on January 8, 2024, regarding claims that his statements were involuntary and because did not receive *Miranda* warnings. The trial court heard testimony from Schlecht on January 9, 2024, and reviewed defendant's video-recorded interview and the transcription.

##### (1) Defendant's statement

Schlecht testified that he investigated the death of Jesse and defendant was suspect. Arrangements were made with prison authorities to interview defendant who was in prison on another charge. He was directed to a classroom at the prison that was furnished with chairs, tables, and had one entrance, which the guard unlocked from the outside. The door did not lock from the inside. Schlecht was accompanied by his partner, Perez, and a prison guard was also present during the interview due to prison policy.

Defendant entered the room accompanied by the prison guard but was not shackled or physically restrained in any way. Defendant sat on the side of the table closest to the door while the detectives sat across from him, and the guard sat off to defendant's left side. All communications with defendant were recorded, and no threats or physical force were used during interview. The detectives were dressed in formal attire and had badges but were not armed.

At the end of the interview, defendant left the room, followed by a guard, and opened the door himself without having to unlock it. Defendant was not placed in restraints before leaving the room.

Schlecht admitted that he told defendant they had a video of the incident but failed to say that the video did not show defendant's face. He testified that he said that to put pressure on defendant to tell the truth and that he accused defendant of being involved when defendant denied it.

### (2)     The video interview

After defendant entered the classroom and was seated, the detectives introduced themselves, asked how defendant was doing, and asked for his name and date and birth. Schlecht asked if defendant knew why they wanted to speak with him. When defendant acknowledged that he did not, defendant mentioned working at a camp, and back and forth comments followed concerning that opportunity for defendant. Schlecht stated that defendant's name had come up and they had spoken with his ex-wife.

Schlecht advised that he first wanted defendant to understand that he did not have to answer any questions if he did not wish to do so, and he could end the conversation and was welcome to leave the room at any time. If the door was locked, it would be opened as soon as defendant indicated he wished to leave. Defendant indicated that he understood and asked if the questions concerned his children. Schlecht explained, "We'll get, we're gonna, we'll talk about that. We'll explain exactly what it's about. Um, but we just have to kinda let, let you know kinda what the rules are, right? Any time, any

10.

time you go somewhere, I'm sure they have rules here, so we're just letting you know what the rules are, right? Does that make sense?" Defendant replied, "Yeah, it does."

The detectives ascertained that defendant had been arrested on September 3, 2021, for the offense for which he was incarcerated. They then focused their questions on an August 28, 2021 incident reported by his ex-wife relating to a restraining order. Defendant had gone to his ex-wife's mother's house looking for his ex-wife, encountered an individual named Elmer, and ultimately slapped Elmer before leaving. His ex-wife had kicked him out of the house in July or August 2021 because he was using methamphetamine.

Detectives questioned defendant concerning his state of mind during that time, his children, and the places he stayed after leaving his ex-wife, including a three-day stay at a sober living facility, his brother Sergio's house, and his cousin Anna's house. Defendant left the sober living home the day before his confrontation with Elmer and started using methamphetamine two or three days after that. At one point during the interview, defendant expressed confusion that they were asking him about these events because he thought they were there to investigate an incident where he had thrown a lock at someone. Schlecht continued to review with defendant where defendant went after his encounter with Elmer and before his arrest for the incident involving Sergio (the offense for which he was serving time). Defendant again expressed confusion that they were questioning him about Elmer because he "just slapped [Elmer] man."

Schlecht commended defendant for accepting responsibility for admitting he slapped Elmer, and discussed how good character might permit him to join up with CAL FIRE upon his release. Schlecht told defendant that he wanted defendant to be honest as to where he went during that period and asked some additional questions concerning the locations defendant frequented.

Approximately 29 minutes into the interview, Schlecht directed defendant's attention to the focus of inquiry, "Oh, okay. Um, so there was something else that

11.

happened the day after your issue with Elmer, and that's why I'm here." He explained, "The thing though, that doesn't have to do with Elmer. It's the day after your thing with Elmer. Okay? Something that you're involved in. Do you know what I'm talking about? Okay. It's gonna be really important for you to be honest with me, 'cause I came with you for a reason, right? So some of the questions I'm gonna ask you, I already know the answers to, okay? So it's really important that you tell me the truth. Do you understand that?" Defendant replied, "Yeah." Schlecht then told defendant that it involved an incident the day after the argument with Elmer and, "I know that … I'm gonna tell you this. Right now, your heart's racing. You wanna know why? Because I can see your vein just go boom, boom, boom, boom, boom, because you know what I'm talking about. And it's really important that you be honest with me."

Schlecht asked defendant to tell him what happened 24 hours after the incident with Elmer. Defendant responded that he did not know. He denied speaking with anyone, or going to any store, and did not respond when asked whether he asked someone for money or food Defendant denied that anyone bought him a drink or food. Schlecht then stated that he was investigating a fight, and defendant denied being involved. Schlecht responded, "This is, this is a problem, [be]cause now we're starting to get the point where you're lying, okay? And I can tell that right now, off the bat. I know you're not telling the truth.… I already know that you were there.… I know that you were there. Okay? And now you're trying to lie to me …."

Perez interjected that they had been doing this for 15 years and did not investigate simple slaps. He stated that they oversaw serious investigations that involved individuals with different reasons for their actions. They wanted to judge the kind of person he was, and Perez felt that while defendant could be crazy while high on drugs, he seemed respectful. Perez warned, "You [have] two babies at home with [your ex-wife]? This, what we're talking about, is serious enough that we're probably not going to see those babies." He stated, "And the way you're gonna get through this is to be honest and tell us

your side of the story because [we] only [know] one side of the story." Perez explained that they had a video, "but it doesn't tell [us] why it happened from your point of view." He further warned that denials would not "cut it," and defendant would find it difficult to dispute that he was not present or not responsible because other people saw what happened, there was a video of the incident, and DNA evidence was found at the scene. Perez further warned, "[Y]ou [have] a future after this, but this is a defining moment on how your future's gonna turn out. Because if, if you continue with what you're telling us and I write this down on paper and go down … to the courthouse," there is evidence and witnesses who place you at the scene and the jury will conclude, "Ah, [defendant is] a liar, he's a cold-blooded fucker who did this on purpose. Let's send him to jail forever."

Schlecht advised defendant that witnesses identified him and DNA evidence placed defendant at the scene. He advised that they wanted to see some contrition and that defendant would take responsibility for his actions. He said that people could understand if they knew the reason and added, "If you give us a reason, well, that might be sufficient." Schlecht said that he knew defendant was not telling the truth and showed a lack of contrition by denying that he knew what happened. He continued, "[Y]ou know you did something wrong, and that's why your heart was racing. You know exactly what we're talking about, and it's stressful. You can't hide that. That happens. Okay? Right now, we need you to be honest. If you can't be honest, then that means we're just gonna take the evidence that we have and we're gonna move forward with this, and that would be, that would actually be very bad for your future."

Perez asked defendant to tell them what happened and stated, "This is gonna happen either way," but it will "look worse if you don't tell us what you experienced that day and what happened." "What's gonna happen after we're done here is gonna happen no matter what. The only difference is if you tell us your side of the story, [we will] write it down, so when it goes forward to what's gonna happen, your side of the story is on

13.

paper.…" Perez concluded, "And if you don't wanna do that, I respect that too, but you're only 24 years old, man, you got two babies."

Schlecht stated, "And depending on what you say, that, that could change how this all goes down." Perez added, "But we don't know what that's gonna be until you tell us what happened." Schlecht then interrupted to obtain a sample of defendant's DNA but advised defendant, "You were there and we have your DNA on our crime scene." After additional explanation regarding the DNA match, Schlecht stated, "So it's not about whether or not you were there or whether or not you did it, the question is why." He explained that if he hurt someone during an arrest, his boss would ask what happened. Defendant said, "There was a reason." Schlecht confirmed, "There was a reason, right? And I have to explain to him my reason. I have to justify.… If I can't explain what happened, then .… I've committed a crime. But if I explain what happened, then maybe I didn't commit a crime .…" He urged defendant to tell them everything that led up to the incident because it all mattered.

Approximately 41 minutes into the interview, defendant explained that he was high. He said he was seeing things and was tripping. He tried to explain that he was not all there, that he was not right, and that he was looking at it all but could not do anything about it. He admitted that someone gave him a drink but said that all he did was watch from a distance.

Schlecht stated, "So that's not what happened, 'cause it's clear, it's on video, clear as day, that's not what happened." He said that he knew defendant remembered what happened but was not telling them and "that's not good for" defendant. Perez advised defendant that they investigated murders. He said, "Do you know how serious this is? This isn't something that you're gonna go like down for a year or two or six months. This is something you're gonna go right down for a long time. And if you can't help us understand why it happened, it looks like it's first-degree murder. You know what that means? It's the worst that you could get."

14.

Schlecht continued, "But if you explain it, there might be a future for you. If you can explain what happened, it might not be that. But you just leaving it like that, like, I'm gonna, I'm gonna tell you this." He then explained that touching between individuals transfers DNA, and when DNA is found, it cannot be anyone else who is responsible. The person responsible for the altercation where someone died was defendant because his DNA was present, and a witness identified defendant as the individual responsible. Perez then advised that they had a video and the perspective of the witness that explains only one side as to what happened. He explained that they had the evidence needed to prove defendant was responsible and the only thing missing was why it happened. They wanted to provide defendant an opportunity to explain his point of view before charging him with murder. Perez added, "I don't know if you're willing to, to just let this go to court, to trial, and just let us take what we have and then without you speaking up for yourself, and telling your side of the story. That's how it's gonna be, dude."

Schlecht said, "What I'm trying to explain to you is you might be able to justify what happened," but they did not know what was said and what happened between defendant and Jesse because the video does not have sound. He suggested that defendant knew what they wished to discuss with him and was probably relieved when they started asking about Elmer. Schlecht explained that the evidence does not tell defendant's side of the story and unless defendant provided his side, it would not look good for him. Perez suggested it would be worse, but defendant did not have to say anything, and they would just obtain his DNA, file the case, and he would be tried for murder. Defendant did not respond.

Schlecht stated, "Yeah. That's fine. If you don't wanna say anything, then we'll just move on. I got other cases, so. It's now or never. You … need to think about this, because we're fl- when we leave here, we're done.… [M]y report's already written, I just gotta type this one up and send it over to the DA's office." He told defendant it was slam dunk case and "if that's how you wanna go, then that's fine. Because you have somebody

15.

that actually did something nice for you, and something happened … to make everything go south," and "that's what we need to know, [be]cause that … could change everything. But by you just not talking about it, you just let other people judge you." He reminded defendant that he had been arrested for multiple felonies, was a convicted felon, and was in prison. Schlecht asked defendant to think how people might view those facts and judge him.

Schlecht advised defendant that people would not give him another chance or the benefit of a doubt. They would see him as someone violating restraining orders and assaulting people before the incident (referring to the assault on Elmer) and assaulting his brother after the incident. "They're gonna look at you as a violent person that they just wanna lock up and throw away the key. Best case scenario. That's unless, that's on the chance that they don't file this as a first-degree murder with special circumstances and you end up on death row." Schlecht warned defendant, "[I]f you don't say anything, then we have to … take it for what it is, for what everybody else is telling us, because you're staying silent, you're not talking about it." He advised that explaining what happened "could change everything for you," while staying silent would result in never seeing your children or freedom again. "If you talk to us about it and you can explain what happened, that could change everything," and you might have a chance of getting out of prison down the road.

Thereafter, at approximately 52 minutes into the interview, defendant told the detectives that he was high and explained that he was seeing things at the time. Perez asked defendant again what happened: "Like I said earlier, you don't, you don't have to talk to us. You don't have to tell us. We explained to you why we need your side of the story, all right?" "We told you you can end this whenever you wanna end this, but I, I really would like to understand your point of view and what happened. The ball's in your court, you're in charge. You're in charge of everything right now, and I want to understand .…"

16.

At approximately 55 minutes into the interview, defendant explained that he was seeing things, such as young girl who then looked old, and he believed the devil tricked him. Perez indicated that defendant's statements had not yet explained what happened when he got into it with Jesse or why Jesse died. Defendant replied that he would not be triggered without a reason and "wouldn't do that to nobody for no reason." Perez asked defendant to explain the reason. Defendant then proceeded to tell the detectives about the incident.

### (3) Trial court ruling

The court concluded that while defendant was in custody, he was in formal custody only on unrelated charges. However, defendant was not in custody on the current case because he was interviewed in a large room, unshackled, and was seated nearest the door. The detectives sat opposite defendant and were unarmed, the length of the interview was one hour and 22 minutes, although the first 30 minutes addressed circumstances not directly related to the murder. The detective's demeanors suggest that they were patient and attempted to ingratiate themselves with defendant. The court concluded that defendant was not in custody to such an extent as to require *Miranda* warnings.

The court next addressed whether the detective's tactics or techniques coerced defendant into an involuntary confession. Regarding Schlecht's statements to defendant that the incident was captured by video, the court agreed that his statement was true, even though he failed to tell defendant that the video did not establish the identity of the attacker. The court observed that the detectives did not mention that Jesse had been stabbed, but defendant admitted he would not stab someone for no reason.

The trial court denied defendant's motion to exclude the statements and found they were admissible at trial.

**B. Defendant Was Not In Custody When Interviewed and *Miranda* Warnings Were Not Necessary**

*(1) Standard of review and applicable law*

To protect a suspect's Fifth Amendment privilege against self-incrimination, *Miranda* requires that, before a custodial interrogation, law enforcement must advise a suspect of the right to remain silent, that any statement made can be used against them in a court of law, that they have the right to the presence of an attorney, and that if they cannot afford an attorney, one will be appointed. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1085.) "A statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in a criminal case." (*People v. Jackson* (2016) 1 Cal.5th 269, 339.)

On review of a trial court's decision on a *Miranda* issue, " ' "we accept the trial court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of *Miranda*." ' " (*People v. Henderson* (2020) 9 Cal.5th 1013, 1023.) When part or all of the questioning was recorded, the facts are undisputed, and we independently review the trial court's factual determinations. (*People v. Jackson, supra*, 1 Cal.5th at p. 339.)

*Miranda* applies only to custodial interrogations, and whether a person is in custody hinges on whether a reasonable person in her or his shoes would feel free to leave. (*Miranda, supra*, 384 U.S. at p. 444; *Howes v. Fields* (2012) 565 U.S. 499, 508–509 (*Howes*).) There is no dispute that the interview here was an "interrogation," which is defined as express questioning or other words and actions on the part of law enforcement that law enforcement should know are reasonably likely to elicit an incriminating response from the suspect. (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301.)

"An interrogation is custodial, for purposes of requiring advisements under *Miranda*, when 'a person has been taken into custody or otherwise deprived of [their]

freedom of action in any significant way.' [Citation.] Custody consists of a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest. [Citations.] When there has been no formal arrest, the question is how a reasonable person in the defendant's position would have understood [their] situation." (*People v. Moore* (2011) 51 Cal.4th 386, 394–395.) The inquiry is objective; it does not depend "on the subjective views harbored by either the interrogating officers or the person being questioned." (*Stansbury v. California* (1994) 511 U.S. 318, 323.)

An incarcerated person interrogated by the police is not necessarily in *Miranda* custody because such a person is not always exposed to " 'the coercive pressures identified in *Miranda*.' " (*People v. Krebs* (2019) 8 Cal.5th 265, 300.) Our Supreme Court recognized in *Krebs* that the United States Supreme Court identified three reasons why someone incarcerated may not experience the coercive pressure of *Miranda* custody. (*Ibid.*, citing *Howes, supra*, 565 U.S. at p. 511.) " 'First, questioning a person who is already serving a prison term does not generally involve the shock that very often accompanies arrest.' [Citation.] 'Second, a prisoner, unlike a person who has not been sentenced to a term of incarceration, is unlikely to be lured into speaking by a longing for prompt release.' [Citation.] 'Third, a prisoner, unlike a person who has not been convicted and sentenced, knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence.' " (*Krebs*, at p. 300.)

*(2)      Analysis*

In *Howes,* the United States Supreme Court declined to adopt a categorical rule regarding whether the questioning of a prison inmate is custodial. (*Howes, supra*, 565 U.S. at p. 505.) Instead, "[w]hen a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation. These include the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted." (*Id.* at p. 514.)

19.

The *Howes* court determined that the defendant was not taken into custody for purposes of *Miranda*, even though the defendant did not invite the interview, did not consent to it in advance, and was not advised that he was free to decline to speak with the deputies. (*Howes, supra*, 565 U.S. at pp. 514–515.) The high court found unpersuasive concerns that the interview lasted between five and seven hours in the evening, it continued well past the time the defendant generally went to bed; the deputies were armed; and one of the deputies, according to the defendant, used " 'a very sharp tone' " and, on one occasion, profanity. (*Id.* at p. 515.) But, in contrast to these circumstances, the deputies told the defendant that he could go back to his cell whenever he wanted, they neither restrained the defendant nor threatened him, and the interview occurred in a well-lit, average-sized conference room where the defendant "was 'not uncomfortable.' " (*Ibid.*) He was offered food and water, and the door to the conference room was sometimes left open. " 'All of these objective facts are consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave.' " (*Ibid.*) Reviewing the facts of the case before it, the court concluded that the defendant "was not in custody within the meaning of *Miranda*." (*Id.* at p. 517.) In coming to this conclusion, the court took "into account all of the circumstances of the questioning" (*id.* at p. 517) but thought the "[m]ost important" factor was that the defendant had been "told at the outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted" (*id.* at p. 515).

Examining the *Howe* factors, we note that Schlecht testified defendant's interview was arranged through prison authorities, but the record contains no evidence as to what defendant was told prior to entering the classroom where the interview occurred. Defendant acknowledged that he did not know why the detectives wished to speak with him. We also note that defendant entered the room without restraints and was not restrained at any time during the interview. While a prison guard accompanied defendant

20.

into the room, the guard sat in the corner of the room while the one and one-half hour interview took place.

Additionally, the detectives sat across a table from defendant in a large classroom, they were not armed, and defendant sat nearest to the door. They told defendant at the outset that he did not have to answer their questions and if defendant wanted to end the conversation and leave, he was welcome to do so at any time and they would stop the conversation. Schlecht testified that the door was not locked, and during the interview, he told defendant that if the door was locked, they would unlock it if he wanted to leave. For the next approximately 30 minutes, defendant answered the detectives' questions, which were focused on events proceeding the murder. At the point where the detectives focused defendant's attention to "an incident" that happened after his "thing with Elmer," the detectives advised defendant that he needed to be truthful. Defendant answered a few questions, but also indicated that he did not remember, and then denied involvement in the altercation. The detectives then took turns explaining to defendant the nature of their evidence and encouraging him to tell them his side of incident, but did so in a conversational tone of voice and never raised their voices. Detectives also told defendant approximately three additional times that he did not have to answer their questions, although they continued to provide him reasons why he should choose to do so. Perez reminded defendant again that he could end the interview, he was in charge, and the ball was in his court, but Perez really wanted to understand defendant's view of what transpired.

In our view, under the totality of the circumstances presented, no restraints were placed upon defendant to coerce him into participating in the interrogation over and above those normally associated with his inmate status. (See *Howes, supra*, 565 U.S. at p. 507.) Hence, *Miranda* warnings were not required, and the trial court correctly rejected defendant's motion to suppress his confession and properly admitted the interview at trial.

### C. Defendant's Statement Was Voluntary

#### (1) Standard of review and applicable law

"Independent of whether a defendant's rights under *Miranda* were observed, his or her statements may not be admitted unless they were voluntary. 'The court in making a voluntariness determination "examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." ' [Citation.] The prosecution bears the burden of proof and must show 'by a preponderance of the evidence the statements were, in fact, voluntary.' " (*People v. Krebs, supra*, 8 Cal.5th at p. 299.)

"When a defendant challenges the admission of a statement on the grounds that it was involuntarily made, the state bears the burden of showing by a preponderance of the evidence that a defendant's statement was, in fact, voluntary. [Citation.] On appeal, we accept the trial court's factual findings as to the circumstances surrounding the confession, provided they are supported by substantial evidence, but we review de novo the ultimate legal question of voluntariness." (*People v. Battle* (2021) 11 Cal.5th 749, 790.) "The facts surrounding an admission or confession are undisputed to the extent the interview is tape-recorded, making the issue subject to our independent review." (*People v. Linton* (2013) 56 Cal.4th 1146, 1177 (*Linton*).)

We consider a statement involuntary—and thus subject to exclusion under the Fifth and Fourteenth Amendments to the United States Constitution—if it is the product of "coercive police conduct." (*People v. Williams* (2010) 49 Cal.4th 405, 437.) We evaluate the totality of the circumstances to determine "whether the defendant's ' "will has been overborne …" ' by coercion." (*Id.* at p. 436.) The presence of police coercion is a necessary, but not always sufficient, element. (See *ibid.*)

We also consider other factors, such as the location of the interrogation, whether the interrogation was repeated or prolonged, and the defendant's maturity, intelligence, education, physical condition, and mental health. (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226; *People v. Dykes* (2009) 46 Cal.4th 731, 752; *Linton, supra*, 56 Cal.4th

22.

at pp. 1178–1179.)  We also consider whether the defendant was deprived of food or sleep and whether the officers made threats, direct or implied promises, or used deceptive practices.  (*Dykes*, at pp. 752–753.)

Our Supreme Court has found a confession not " 'essentially free' " when a suspect's confinement was physically oppressive, invocations of their *Miranda* rights were flagrantly ignored, or the suspect's mental state was visibly compromised.  (*People v. Spencer* (2018) 5 Cal.5th 642, 672 (*Spencer*), quoting & citing *People v. Neal* (2003) 31 Cal.4th 63; see *People v. McClary* (1977) 20 Cal.3d 218 (*McClary*), overruled on other grounds in *People v. Cahill* (1993) 5 Cal.4th 478, 509–510 fn. 17; *People v. Hogan* (1982) 31 Cal.3d 815, overruled on other grounds in *People v. Cooper* (1991) 53 Cal.3d 771, 836.)

###### (2)     Analysis

We are not persuaded the circumstances of defendant's interview demonstrate his statement was coerced.  We have watched the one and one-half hour interview video and are convinced that no police coercion occurred and the detectives did not overbear defendant's will.

As the Supreme Court did in *Spencer*, we begin by noting certain factual predicates missing from defendant's involuntariness claim.  (*Spencer, supra*, 5 Cal.5th at p. 672, quoting *People v. Holloway* (2004) 33 Cal.4th 96, 114 (*Holloway*).)  Defendant makes " 'no claim of physical intimidation or deprivation' " and " 'no assertion of coercive tactics other than the contents of the interrogation itself.' "  (*Ibid.*)  In *Spencer*, the court contrasted these facts with *People v. Neal*, "a case in which we held the confession involuntary, in part, because the defendant 'was placed [overnight] in a cell without a toilet or a sink,' 'did not have access to counsel or to any other noncustodial personnel,' 'was not taken to a bathroom or given any water until the next morning,' and 'was not provided with any food until some time following the third interview, after more

23.

than 24 hours in custody and more than 36 hours since his last meal.' " (*Spencer*, at p. 672, quoting *Neal, supra*, 31 Cal.4th at p. 84.)

The one and one-half hour interview was not unduly long, and defendant never asked for it to stop, even though at times he failed to answer the detectives' questions, and he had been told he could terminate the interview and did not have to speak with them. No physical punishment occurred, and defendant was not deprived of food or sleep. The detectives did not subject him to either repeated or prolonged questioning. The nature of the questioning and the length of the interview do not establish that defendant's will was overborne. (See *People v. Dykes, supra*, 46 Cal.4th at p. 752.) The questioning was not abusive, and defendant never requested to terminate the interview or leave the room. Nothing in the video indicates that defendant felt coerced in the constitutional sense of the term at any time while he was being questioned.

Like *Spencer*, "[w]e also find significant [the detectives'] conduct, and [defendant]'s response to it." (*Spencer, supra*, 5 Cal.5th at p. 673.) As in *Spencer*, while the detectives confronted defendant, they did so by gradually obtaining more incriminating details and refraining from "vituperative statements," "name-calling," any "obvious strong-arm tactics," and "base appeals to [defendant]'s deeply held beliefs." (*Ibid.*) As in *Spencer*, defendant "gave coherent, responsive answers and did not appear excessively fearful or distressed." (*Ibid.*) Similarly, defendant "also had the wherewithal to articulate … a version of events that minimized his involvement," before finally admitting that that he stabbed Jesse. (*Ibid.*)

Defendant maintains that the inculpatory statements he made during the interrogation were coerced by promises of leniency if he confessed and threats of harsher punishment if he did not. However, we are not persuaded that his statements were coerced.

Schlecht and Perez repeatedly exhorted defendant to tell the truth and presented him with evidence that contradicted his initial denial that he was not present during the

incident. But *Spencer* rejected any conclusion that certain interrogation techniques amounted to coercion. (*Spencer, supra*, 5 Cal.5th at p. 674.) Confronting a defendant with inconsistencies in his statement is "not an improper interrogation technique, as an interrogation may include ' "exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect." ' " (*Ibid*.; see *Linton, supra*, 56 Cal.4th at p. 1178 [officers can exhort a suspect to tell the truth and repeatedly express that they believe a suspect is lying]; *People v. Williams, supra*, 49 Cal.4th at p. 444 [officers can engage in vigorous and repetitive questioning of suspects meant to ascertain a defendant's involvement in crimes].) This is especially so where the officer's exhortations and persistent questions are relatively "low key" as they were in this case. (*Linton*, at p. 1178.)

Defendant argues that the detectives threatened to seek the death penalty and prevent defendant from seeing his children if he did not confess. We do not agree. Perez and Schlecht reminded defendant that the offense was serious enough that he might not see his children and could be sentenced to life in prison or face the death penalty. But the detectives did not suggest that defendant would not be charged with murder or special circumstances if he confessed, they truthfully advised him that there was substantial evidence he killed Jesse, but whether what he did was a crime would depend upon the reason he did it and could affect the length of his sentence. For this reason, defendant's reliance on *People v. Brommel* (1961) 56 Cal.2d 629, 633–634, overruled on another ground in *People v. Cahill, supra*, 5 Cal.4th at pages 509–510, footnote 17, and *McClary, supra*, 20 Cal.3d at page 229, overruled on another ground in *Cahill*, at pages 509–510, footnote 17, is misplaced.

In *Brommel*, after the defendant denied the accusations against him, a police officer told him that the officer would write the word "Liar" on the police report if the defendant did not change his story, and the judge would then not believe him because he would be "branded as a liar." (*People v. Brommel, supra*, 56 Cal.2d at p. 633.) In

*McClary*, after a 16-year-old defendant denied her involvement in a murder, police made statements that implied she would be charged as a principal to murder and face the death penalty if she refused to admit her true involvement in the murder. (*McClary, supra*, 20 Cal.2d at pp. 222–224.) In both cases, law enforcement conveyed clear threats of negative consequences and harsher treatment absent a confession.

Unlike *Brommel*, the detectives' conduct in this case does not rise to the level of a threat or implied promise of leniency. To the contrary, the detectives in this case made it clear that they were only asking for the truth and never threatened to brand defendant a liar, much less communicate any information to the judge if defendant did not change his story. Unlike *McClary*, defendant was not warned that he may face the death penalty unless he acknowledged his involvement in the murder. Defendant was told that Jesse had died, and defendant faced the punishment of substantial time in prison or death unless there was some justification for actions.

The Supreme Court reiterated in *Spencer* that "a constitutional violation will be found 'only where the confession results directly from the threat such punishment will be imposed if the suspect is uncooperative, coupled with a "promise [of] leniency in exchange for the suspect's cooperation." ' " (*Spencer, supra*, 5 Cal.5th at p. 675.) Although the detective in *Spencer* raised the possibility of the death penalty, "the statement was made in isolation and Spencer did not appear cowed by the remark." (*Id.* at p. 675; see *id.* at p. 671 [interrogating officer's isolated remark about the death penalty, " '[I]f you don't think I can't prove this case, if you don't think I can't fry you, you're sadly mistaken,' " among other statements, did not amount to a promise of leniency].)

The detectives here clearly stated that defendant was facing a murder charge, and this was his opportunity to explain what happened. However, they never suggested that if defendant confessed, he would not be charged with murder, only that his reasons for his actions might affect whether what he did was a crime. The law is clear that " 'mere advice or exhortation by the police that it would be better for the accused to tell the truth

26.

when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary.… Thus, "[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement in response will not be considered involuntarily made.' " (*Holloway, supra*, 33 Cal.4th at p. 115; see *People v. Carrington* (2009) 47 Cal.4th 145, 172 ["when law enforcement officers describe the moral or psychological advantages to the accused of telling the truth, no implication of leniency or favorable treatment at the hands of the authorities arises"]; *People v. Orozco* (2019) 32 Cal.App.5th 802, 820 ["Law enforcement does not violate due process by informing a suspect of the likely consequences of the suspected crimes or of pointing out the benefits that are likely to flow from cooperating with an investigation."].)

In *Spencer*, our Supreme Court concluded that the officer's suggestion that the crime was an accident did not amount to a promise of leniency and was a permissible interrogation tactic, specifically in light of the officer's express statement that he could not make any promises. (*Spencer, supra*, 5 Cal.5th at p. 675.) In *Holloway*, our Supreme Court found that Holloway's incriminating statements made during the course of his interrogation were voluntary. The court observed that the detective "gave [Holloway] no such misleading assurances. No specific benefit in terms of lesser charges was promised or even discussed, and [a detective's] general assertion that the circumstances of a killing could 'make[] a lot of difference' to the punishment, while perhaps optimistic, was not materially deceptive." (*Holloway, supra*, 33 Cal.4th at p. 117; see also *id*. at p. 116 ["[t]o the extent [the detective's] remarks implied that giving an account involving blackout or accident might help [the] defendant avoid the death penalty, [the detective] did no more than tell [the] defendant the benefit that might ' "flow[] naturally from a truthful and honest course of conduct" ' "].)

The detectives also told defendant that his false denial of involvement was easily contradicted by the evidence and would not engender sympathy from a judge or jury.

27.

However, "[n]o constitutional principle forbids the suggestion by authorities that it is worse for a defendant to lie in light of overwhelming incriminating evidence." (*People v. Carrington, supra*, 47 Cal.4th at p. 174; see, e.g., *People v. Case* (2018) 5 Cal.5th 1, 25–26 [finding the defendant's incriminating statements were not coerced where detectives told the defendant he was facing the death penalty, that he would be better off if he confessed, and that providing an explanation could benefit him " 'in the long run' "].) The detectives never mentioned particular outcomes or intimated that they had any control over the punishment defendant might receive. We believe these statements are more properly characterized as urging defendant to tell the truth rather than making promises of leniency.

Based on the totality of the circumstances, the prosecution met its burden of establishing by a preponderance of the evidence that defendant's statement was voluntary. We reject any assertion that detectives brought influences upon defendant that overcame his will to resist. Accordingly, defendant's interview was admissible at his trial, and the trial court did not err in denying defendant's motion to exclude or suppress his statement.

## II. The trial court correctly declined to instruct the jury as to the lesser included offense of voluntary manslaughter.

### A. Background

Defendant argues that the trial court erred by declining to instruct the jury on voluntary manslaughter based on heat of passion and imperfect self-defense. He contends evidence that defendant and Jesse fought and Jesse possessed a knife justified the instructions.

The trial court summarized the earlier jury instruction conference held in chambers and advised counsel that the jury would be instructed as to second degree murder as a lesser included offense. The defense had requested instructions as to voluntary manslaughter under theories of heat of passion and imperfect self-defense and involuntary manslaughter. A lengthy in-chambers discussion followed concerning the

28.

effect of provocation on reducing first degree murder to second degree murder, the provocation that negated malice and reduced the charge to voluntary manslaughter, and whether substantial evidence triggered the court's duty to instruct on these theories.

The trial court permitted additional argument on the record but denied defendant's request. First, the court declined to instruct the jury as to involuntary manslaughter because defendant's act of stabbing Jesse in the neck was not a lawful act or an act of criminal negligence. As to voluntary manslaughter, the trial court concluded the only evidence of provocation was defendant's statement that he was triggered by Jesse's comments regarding children in the trunk of a car and that it was insufficient to establish provocation objectively. Additionally, the court concluded that the evidence failed to support an instruction regarding unreasonable self-defense because no evidence supported an argument that defendant believed he was in imminent danger.

## B.  Standard of Review and Applicable Law

The trial court possesses a duty to instruct on all lesser included offenses "when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged." (*People v. Breverman* (1998) 19 Cal.4th 142, 154, disapproved on other grounds *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7.)  However, "the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.]  'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could … conclude[]" ' that the lesser offense, but not the greater, was committed." (*Breverman*, at p. 162, first bracketed insertion added; see *People v. Vargas* (2020) 9 Cal.5th 793, 827 [instruction "is not required when the evidence supporting such an instruction is weak"]; *People v. Westerfield* (2019) 6 Cal.5th 632, 718 [instruction not required when based on speculation].)  Whether or not a

29.

reasonable jury could have so concluded based on the evidence in this case is a matter we determine de novo.  (See *People v. Cole* (2004) 33 Cal.4th 1158, 1215.)

"Substantial evidence is evidence from which a jury could conclude beyond a reasonable doubt that the lesser offense was committed.  [Citations.]  Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense."  (*People v. Simon* (2016) 1 Cal. 5th 98, 132.)  " 'In deciding whether evidence is "substantial" in this context, a court determines only its bare legal sufficiency, not its weight.' "  (*People v. Moye* (2009) 47 Cal.4th 537, 556.)

Murder is "the unlawful killing of a human being … with malice aforethought." (§ 187, subd. (a).)  "[M]alice may be express or implied."  (§ 188, subd. (a).)  "Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger."  (*People v. Elmore* (2014) 59 Cal.4th 121, 133.)

A person who intentionally and unlawfully kills "upon a sudden quarrel or heat of passion" is guilty of voluntary manslaughter.  (§ 192, subd. (a).)  " 'Manslaughter, an unlawful killing without malice, is a lesser included offense of murder.' [Citation.] 'Although section 192, subdivision (a), refers to "sudden quarrel or heat of passion," the factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation.' ([Citation]; see *People v. Rios* (2000) 23 Cal.4th 450, 461 [certain mitigating circumstances will 'reduce an intentional, unlawful killing from murder to voluntary manslaughter "by negating the element of malice" ' (italics omitted)].)  'The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.' [Citation.]  '[T]he victim must taunt the defendant or otherwise initiate the provocation.' [Citations.]  The ' "heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances...." ' [Citation.]  ' "[I]f

sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter." ' " (*People v. Avila* (2009) 46 Cal.4th 680, 705, third, fifth, & eighth bracketed insertions in original.)

Heat of passion includes both subjective and objective components. (*People v. Moye, supra*, 47 Cal.4th at pp. 549–550.) To satisfy the objective component, the defendant's heat of passion must be the result of " ' " 'sufficient provocation,' " ' " caused or initiated by the victim, that "would cause an ordinary person of average disposition to act rashly." (*Id*. at pp. 549–550.) This objective component prevents the defendant from "set[ting] up his own standard of conduct" to justify his actions. (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.)

The second factor that may preclude the formation of malice and reduce murder to voluntary manslaughter is unreasonable self-defense. (*People v. Soto* (2018) 4 Cal.5th 968, 974.) "Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant actually but unreasonably believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." (*In re Christian S.* (1994) 7 Cal.4th 768, 771.)

"[I]mperfect self-defense is not an affirmative defense, but a description of one type of voluntary manslaughter. Thus the trial court must instruct on this doctrine, whether or not instructions are requested by counsel, whenever there is evidence substantial enough to merit consideration by the jury that under this doctrine the defendant is guilty of voluntary manslaughter." (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.)

## C. Analysis

We conclude the trial court did not err in refusing defendant's request to instruct the jury on voluntary manslaughter because " 'there was no substantial evidence

deserving of consideration which might have led reasonable jurors to reach a verdict of voluntary manslaughter.' " (*People v. Kanawyer* (2003) 113 Cal.App.4th 1233, 1248.)

To satisfy the objective component of a heat of passion theory of manslaughter, the victim must taunt the defendant or otherwise initiate the provocation (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306), which disturbed the defendant's reason such that an ordinary person of average disposition would act from this passion, without due deliberation and reflection, rather than from judgment. (*People v. Beltran* (2013) 56 Cal.4th 935, 948, 957.)

"Perfect self-defense requires that 'one must actually *and* reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury.' " (*People v. Thomas* (2023) 14 Cal.5th 327, 386.) Imperfect self-defense " 'occurs when a defendant acts in the actual but unreasonable belief that he or she is in imminent danger of great bodily injury or death' " and reduces the crime to the lesser included offense of murder by negating a defendant's malice. (*Ibid.*)

In this case, neither T.M. nor defendant's own statement provide evidence that Jesse taunted defendant or initiated any provocation sufficient to satisfy the objective test for heat of passion. T.M. testified that she did not hear an argument, and the men had been talking amicably. Defendant's sole stated rationale for stabbing Jesse was that Jesse offended him by joking about children being in the trunk of a car. Similarly, there was no evidence that defendant actually believed he needed to defend himself, especially in light of defendant's statements that Jesse pulled the knife to defend himself from defendant's attack and never claimed he stabbed Jesse in self-defense.

Defendant argues, however, that Juan's testimony provides substantial evidence satisfying both factors which might reduce murder to voluntary manslaughter if the jury disregarded defendant's statement or T.M.'s testimony in light of inconsistencies with her statements at the time of the incident as unreliable. Juan testified, although inconsistently, that he heard loud male voices and saw two individuals fighting and then

saw a stabbing. We note that Juan also testified two men were fighting but denied seeing them punch each other. He also testified that he believed he saw a stabbing because he glimpsed the man had a knife and later saw Jesse's stab wound, although he did not see the stabbing itself. Thus, the evidence does not necessarily support defendant's argument that Juan saw the stabbing after a fight had already commenced, especially considering T.M.'s testimony that defendant attempted to stab Jesse again before defendant ran away.

But even if the jury accepted all defendant's suggested inferences as evidence that Jesse and defendant fought verbally or even physically before defendant stabbed him, that evidence is not sufficient to establish Jesse was responsible for conduct that rose to the level of objective provocation. Taunting words or simple assault, without more, are not legally sufficient provocation. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826.) Juan's testimony provides no evidence that Jesse initiated the altercation or provocation. Additionally, there is no evidence that defendant actually believed that he was in imminent danger, and Juan's description of the altercation does not suggest a scenario where defendant could have believed himself in imminent danger of death or great bodily injury when he stabbed Jesse.

Defendant argues the jury could have found that he had an actual but unreasonable belief in the need to use self-defense because Jesse had a knife. While there was evidence that Jesse had a knife and stabbed defendant, Juan's testimony provides no evidence that defendant was aware that Jesse was armed with a knife or that Jesse attacked defendant with the knife before defendant stabbed Jesse.

Any version of events involving a loud argument and Jesse's possession of a knife (assuming the jury found reason to disregard T.M.'s testimony and defendant's own statement) requires the jury to adopt inferences based upon impermissible speculation that cannot justify an instruction on either self-defense, imperfect self-defense, or heat of passion. (See *People v. Simon, supra*, 1 Cal.5th at p. 132 ["[s]peculative, minimal, or insubstantial evidence is insufficient to require an instruction"].)

Here, the trial court properly refused to instruct on a theory of voluntary manslaughter because there was no evidence of an objective act of provocation by Jesse and no substantial evidence that defendant had either a reasonable or unreasonable and actual belief that he needed to defend himself. The trial court correctly declined to instruct the jury on imperfect self-defense and heat of passion voluntary manslaughter.

**DISPOSITION**

The clerk of the superior court is directed to amend the April 30, 2024 abstract of judgment at paragraph 2 to include the one-year consecutive sentence as to the section 12022, subdivision (b)(1) enhancement and forward the amended abstract of judgment to the Department of Corrections and Rehabilitation.

The judgment is affirmed as modified.

HILL, P. J.

WE CONCUR:

DETJEN, J.

GUERRA, J.*

---

\* Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

34.